**GNFH, INC. et al., Appellants,**

**v.**

**WEST AMERICAN INSURANCE CO. et al., Appellees.**

[Cite as *GNFH, Inc. v. W. Am. Ins. Co.,* 172 Ohio App.3d 127, 2007-Ohio-2722.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 06–CA–50.

Decided June 1, 2007.

130

Beitzel Law Office and David E. Beitzel, for appellants.

Droder & Miller Co., L.P.A., and W. John Sellins, for appellees.

FAIN, Judge.

{¶ 1} Plaintiffs-appellants Hector Gonzalez, GNFH, Inc., Nick Pappas, and Lincoln Square Restaurant appeal from a summary judgment rendered against them on their claim for declaratory judgment. In the trial court, appellants claimed that defendants-appellees West American Insurance Company and Ohio Casualty Insurance Company (collectively, "West American") owed a duty of defense in an underlying lawsuit brought by Linda Trader against Gonzalez, GNFH, and several other parties. The trial court disagreed and found no duty to defend.

{¶ 2} Appellants contend that the trial court erred in finding no duty to defend. We agree. The judgment of the trial court is reversed, and this cause is remanded for further proceedings.

I

{¶ 3} In February 2004, Linda Trader filed a 15–count complaint in Miami County Common Pleas Court against GNFH, Lincoln Square Restaurant, Hector Gonzalez, Stacy Gonzalez, and Debbie Robinson Lawver. Trader alleged that she

had been employed as a waitress at Lincoln Square Restaurant between June 1999 and late January 2002. Trader further alleged that Lawver and both Gonzalezes were the owners and operators of Lincoln Square and also managed the restaurant. GNFH was identified as a corporation doing business in Troy, Ohio, as Lincoln Square Restaurant.

{¶ 4} According to the complaint, male co-workers, including Hector Gonzalez, sexually harassed Trader during her employment by making unwelcome and vulgar remarks about her conduct and appearance, by groping her breasts, buttocks, and genitalia, by forcing her face toward them to kiss her mouth, and by inflicting bruises and scratches, which Trader regularly incurred in fending off physical contact. In addition, Trader claimed that she was physically assaulted by a male employee on January 27, 2002, while trying to fend off unwelcome sexual contact. At that point, she quit her employment. The complaint alleged that Trader had repeatedly complained to the Gonzalezes and Lawver about the offensive conduct, but nothing was done.

{¶ 5} After setting forth these facts, Trader listed 15 claims, including (1) quid pro quo sexual harassment in violation of R.C. 4112.02; (2) hostile-employment-environment harassment in violation of R.C. 4112.02; (3) gender discrimination in violation of Title VII of the Civil Rights Act of 1964 and R.C. 4112.02; (4) gender harassment in violation of Title VII; (5) *Genaro v. Cent. Transport* claims, which allow supervisors or managers to be held jointly and severally liable in their individual capacity for conduct violating R.C. Chapter 4112; (6) intentional infliction of emotional distress based on the failure of the Gonzalezes and Lawver to stop or remedy the harassment; (7) negligent infliction of emotional distress, based on the negligent failure of the Gonzalezes and Lawver to stop the harassment; (8) workplace retaliation in violation of R.C. 4112.02; (9) constructive discharge; (10) violation of Ohio Civil Rights—R.C. 4112.01 et. seq.; (11) negligent hiring, training, retention and supervision; (12) assault and battery; (13) vicarious liability; (14) breach of contract of employment; and (15) a claim for punitive damages.

{¶ 6} Notice of the lawsuit and a request to defend was sent to West American in February 2004. West American agreed to defend Lincoln Square, Stacy Gonzalez, and Lawver under a reservation of rights but declined to provide a defense for either Hector Gonzalez or GNFH. West American claimed that Hector's alleged acts fell outside the scope of employment or his duties related to the conduct of his business. West American also claimed that GNFH did not meet the definition of an insured under the policy. As a result of the denial of defense, both GNFH and Gonzalez were required to retain their own counsel.

{¶ 7} After a jury trial, the trial court entered judgment in June 2005 against GNFH/Lincoln Square and Hector Gonzalez, jointly and severally, in the amount

of $8,750 on the hostile employment or discrimination claim; against GNFH/Lincoln Square in the amount of $875 on the battery claim; against GNFH/Lincoln Square in the amount of $7,000 on the negligent supervision or retention claim; and against GNFH/Lincoln Square and Hector Gonzalez, jointly and severally, in the amount of $17,500 for punitive damages. The trial court also noted that jury interrogatories had found damages for negligent infliction of serious emotional distress to be $875. However, because the jury had answered all three interrogatories on this issue in favor of the three defendants, the court concluded that the jury did not find liability on negligent infliction of emotional distress. Accordingly, the court did not assess damages on this claim.

{¶ 8} The trial court also awarded attorney fees to Trader. A judgment entry was filed in August 2005 awarding Trader $119,801.03 and costs for compensatory and punitive damages and for attorney fees.

{¶ 9} In October 2005, the present action was filed by GNFH, Lincoln Square, Hector Gonzalez, Stacy Gonzalez, Nick Pappas, and NG & G, Inc., against West American and various John Doe defendants. The complaint included claims for breach of contract, bad faith, and breach of fiduciary duty, based on West American's failure to defend and the denial of insurance coverage. The complaint also requested compensatory and punitive damages and attorney fees.

{¶ 10} West American filed an answer and counterclaim for declaratory judgment, asking the court to declare that West American had no duty to defend or to pay defense costs and that West American had no duty to pay the judgment awarded to Trader. The trial court subsequently consolidated Trader's civil action with the present action. In addition, the court ordered Trader to file a supplemental complaint pursuant to R.C. 3929.06. Trader complied with the court's request and filed a supplemental complaint seeking payment of the judgment.

{¶ 11} After the parties filed cross-motions for summary judgment, the trial court rendered summary judgment in favor of West American, finding that West American had no duty to defend or to pay the judgment. The court reasoned that the acts alleged in the complaint were sexual-harassment and sexual-battery torts and classified them as "direct intent" torts, which are precluded in Ohio from being covered by insurance. In addition, the court rejected estoppel. The court noted that while West American had defended three insureds in the underlying action, appellants had failed to specifically plead estoppel when they sought declaratory judgment. Accordingly, the court refused to consider estoppel, other than noting that West American would be estopped from denying that GNFH was an insured. The basis of this decision was that GNFH was the party

operating the restaurant at the address listed on the insurance policies and GNFH was also the party who had paid the premiums to West American.

{¶ 12} From the summary judgment rendered against them, appellants appeal.

## II

{¶ 13} Appellants' sole assignment of error is as follows:

{¶ 14} "The trial court erred in finding there was no duty to defend Hector Gonzalez or GNFH, Inc. (plaintiff-appellants herein)."

{¶ 15} Under this assignment of error, appellants contend that the trial court improperly engaged in Monday morning quarterbacking by basing its coverage decision on the outcome of the trial in the underlying case. Appellants claim that the trial court should have instead looked to the complaint in the underlying case, which contains allegations that place GNFH and Gonzalez arguably or potentially within policy coverage.

{¶ 16} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks* (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court. *Broadnax v. Greene Credit Serv.* (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167, and *Long v. Tokai Bank of California* (1996), 114 Ohio App.3d 116, 119, 682 N.E.2d 1052.

{¶ 17} Regarding the duty to defend, the Ohio Supreme Court has said:

{¶ 18} "The duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established. * * * In *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874, this court held that under a liability insurance policy, it is the scope of the allegations against the insured that determines whether an insurance company has a duty to defend the insured. * * * '[W]here the complaint brings the action within the coverage of the policy the insurer is required to make defense, regardless of the ultimate outcome of the action or its liability to the insured.' * * * The *Motorists* holding was expanded in *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 179, 9 OBR 463, 459 N.E.2d 555, in which we stated that 'the duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint.'" *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121, at ¶ 35.

{¶ 19} In *Willoughby Hills,* the Ohio Supreme Court also stressed:

{¶ 20} "[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim." 9 Ohio St.3d at 180, 9 OBR 463, 459 N.E.2d 555.

{¶ 21} Relying on *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, West American contends that where an insurer does not agree to defend groundless, false, or fraudulent claims, the insurer's duty to defend does not depend solely on the allegations in the complaint. In *Gill,* the murderer of a child pleaded guilty to aggravated murder and then asked his insurer to defend a wrongful-death action brought by the parents of the child he had murdered. Id. at 109, 30 OBR 424, 507 N.E.2d 1118. Although the parents' complaint had pleaded negligence only, the Ohio Supreme Court stated:

{¶ 22} "[W]here the conduct which prompted the underlying wrongful death suit is so indisputably outside coverage, we discern no basis for requiring the insurance company to defend or indemnify its insured simply because the underlying complaint alleges conduct within coverage. Such an approach would ignore patent realities for no overriding reason. To compel the insurer to defend regardless of the true facts, where, as here, the insurer has not promised to defend groundless, false or fraudulent claims, imposes an onerous burden for which the insurer did not bargain. Courts should not be expected to feign ignorance of a criminal conviction which clearly takes the conduct outside coverage. In cases such as this, this court will no longer unquestioningly elevate the allegations in the underlying tort complaint above all consideration of the true facts as established by the insurer unless the insurer has agreed to defend regardless of the true facts." Id. at 113, 30 OBR 424, 507 N.E.2d 1118.

{¶ 23} West American is incorrect, however, in relying on *Gill,* because the Ohio Supreme Court subsequently limited the holding in *Gill* to the facts of the case. See *Cincinnati Ins. Co. v. Colelli & Assoc., Inc.* (2000), 95 Ohio St.3d 325, 325, 767 N.E.2d 717.

{¶ 24} After *Gill* was decided in 1987, insurers who issued policies requiring defense of false or groundless claims would be making poor business decisions, because *Gill* allowed extensive litigation over coverage whenever language of this type was omitted. The difficulty caused by *Gill* is demonstrated by the underlying history in *Colelli,* which involved a three-year battle and multiple appeals before the insured was able to obtain a decision in 1999 that the insurer was obligated to defend the underlying case. During that three-year period, the insured had to bear its own defense costs, not just for the underlying action, but

for the declaratory judgment action as well. Furthermore, while the insurer began providing a defense in 1999, the judgment for more than $124,000 in attorney fees was not paid until 2002, after further appeals had been exhausted. See *Cincinnati Ins. Co. v. Colelli & Assoc., Inc.* (Apr. 5, 2000), Wayne App. No. 99CA0028, 2000 WL 354166, *1, and *Cincinnati Ins. Co. v. Colelli & Assoc., Inc.*, Wayne App. No. 04CA0008, 2004-Ohio-4726, 2004 WL 1969367, at ¶ 5–6 (discussing the history of the coverage litigation, which spanned eight years). Obviously, many insured parties would have neither the resources nor the stamina to engage in this type of protracted battle over coverage.

{¶ 25} In light of the holding in *Colelli*, coverage in the present case will depend on the allegations in the complaint. In deciding the coverage issue, the trial court stated that it had considered the allegations in the complaint. However, the court interpreted the allegations to mean that only direct-intent torts were involved. Therefore, despite finding some ambiguity in the insurance policy, the trial court rejected coverage, because providing insurance for direct-intent torts is against Ohio public policy.

{¶ 26} The trial court correctly concluded that insurance coverage for direct-intent torts is against public policy in Ohio. However, the trial court also extended the doctrine beyond the scope of what the Ohio Supreme Court has established in cases to date. In 1990, the Ohio Supreme Court considered whether public policy prohibits insurance policies from providing coverage for intentional torts. See *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962. The Ohio Supreme Court noted that it had previously adopted a definition of intentional tort, which states that "an intentional tort occurs when '* * * the actor desires to cause consequences of his act, or * * * he believes that the consequences are substantially certain to result from it.'" 49 Ohio St.3d at 173, 551 N.E.2d 962, quoting 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A. The court then stressed:

{¶ 27} "This definition encompasses two different levels of intent. The first level, which we will refer to as 'direct intent,' is where the actor does something which brings about the exact result desired. In the second, the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result." Id.

{¶ 28} Ultimately, the Ohio Supreme Court held that public policy permits employers to secure insurance for "compensatory damages sought by an employee in tort where the employer's tortious act was one performed with the knowledge that injury was substantially certain to occur." Id. at syllabus. In this regard, the court stressed:

{¶ 29} "In the case of a 'direct intent' tort, the presence of insurance would encourage those who deliberately harm another. In torts where intent is inferred from 'substantial certainty' of injury, the presence of insurance has less effect on the tortfeasor's actions because it was not the tortfeasor's purpose to cause the harm for which liability is imposed. * * * In the latter situation, the policy of assuring victim compensation should prevail." Id. at 176, 551 N.E.2d 962.

{¶ 30} Subsequently, in *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, the Ohio Supreme Court stated that "[i]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended." Id. at syllabus. The court also rejected the position of the Ninth District Court of Appeals, which had held the Ohio Supreme Court's decision in *Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, to be controlling. Specifically, the Ninth District had reasoned that " 'it is the intentional nature of the act of the insured, rather than the result of such an act, * * * which determines whether coverage will apply.' " 58 Ohio St.3d at 190, 569 N.E.2d 906.

{¶ 31} The Ohio Supreme Court disagreed and distinguished *Gill*, stating:

{¶ 32} "[O]ur holding that there was no coverage in *Gill* was premised on the facts that the insured *intended to cause the injury* of another person, and that this intent was conclusively established by the insured's plea of guilty to aggravated murder. Stated otherwise, our decision was based on a finding that the insured intended to cause an injury, *i.e.*, the death of an eleven-year-old girl. While *Gill* used language regarding the intentional act or conduct of the insured, *Gill* actually stands for the proposition that it is the resultant *injury* which must be intended for the exclusion to apply to deny coverage." (Emphasis sic.) Id. at 191, 569 N.E.2d 906.

{¶ 33} In 1993, the Eleventh District Court of Appeals noted that the Ohio Supreme Court had not yet decided whether an intent to injure could be inferred as a matter of law from the intentional act of sexually molesting a minor. See *Westfield Ins. Co. v. Roberts* (1993), 88 Ohio App.3d 532, 534, 624 N.E.2d 343. The Eleventh District noted that the Fourth and Eighth District Courts of Appeals had accepted this standard, while the Ninth District had not. Id. After considering the issues, the Eleventh District held that "in the unique circumstance where the insured has pled guilty to the sexual molestation of a minor, that the intent to molest and the intent to harm cannot be divorced from one another, with the result that the intent to harm may be inferred from the commission of the crime." 88 Ohio App.3d at 537, 624 N.E.2d 343.

{¶ 34} Three years later, in *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 665 N.E.2d 1115, the Ohio Supreme Court applied an "inferred intent" rule to claims involving sexual molestation of a minor, stating:

{¶ 35} "Incidents of intentional acts of sexual molestation of a minor do not constitute 'occurrences' for purposes of determining liability insurance coverage, as intent to harm inconsistent with an insurable incident is properly inferred as a matter of law from deliberate acts of sexual molestation of a minor." Id. at paragraph one of the syllabus.

{¶ 36} The Supreme Court noted that under this rule:

{¶ 37} "[I]ntent to injure is inferred as a matter of law from the act of sexual abuse of a child itself, as harm is deemed inherent in the sexual molestation, regardless of the offender's expression of subjective intent, and regardless of whether the sexual abuse was 'nonviolent' or unaccompanied by penetration, or whether the abuse took place over a long or short period of time.  * * * The rule is based on the premise that acts of sexual molestation and the fact of injury caused thereby are 'virtually inseparable,' * * * in that, in a case of child molestation, 'to do the act is necessarily to do the harm which is its consequence; and * * * since unquestionably the act is intended, so also is the harm.'" 76 Ohio St.3d at 36–37, 665 N.E.2d 1115.

{¶ 38} Accordingly, the Ohio Supreme Court held that the "public policy of the state of Ohio precludes issuance of insurance to provide liability coverage for injuries resulting from intentional acts of sexual molestation of a minor." Id. at paragraph two of the syllabus.  The same day, the court rejected insurance coverage under a homeowner's policy for a father who had been sued for negligently advertising his 16–year–old son as a baby sitter and for negligently supervising the son.  The son had allegedly committed acts of sexual abuse on children for whom the son baby-sat.  In this regard, the court commented:

{¶ 39} "In *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 665 N.E.2d 1115, decided this date, we held that incidents of intentional acts of sexual molestation of a minor do not constitute 'occurrences' for purposes of determining insurance coverage;  that intent to harm inconsistent with an insurable incident is properly inferred as a matter of law from deliberate acts of sexual molestation of a minor;  and that the public policy of the state of Ohio, which prohibits the issuance of insurance to indemnify damages flowing from intentional torts, precludes issuance of insurance to provide liability coverage for injuries resulting from intentional acts of sexual molestation of a minor." *Cuervo v. Cincinnati Ins. Co.* (1996), 76 Ohio St.3d 41, 43, 665 N.E.2d 1121.

{¶ 40} In the present case, the trial court relied on *Gearing*'s theory of "inferred intent" to find that the alleged acts of sexual harassment and sexual

battery were inseparable from the harm. However, Ohio Supreme Court decisions after *Gearing* indicate that the trial court's interpretation is too broad.

{¶ 41} In 1999, the Ohio Supreme Court reiterated in *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 720 N.E.2d 495, that "[n]ot all intentional torts are uninsurable in Ohio." The court noted its prior distinction in *Harasyn* between two levels of intent, i.e., "direct intent" and "substantial certainty," and stressed that insurance coverage is unavailable only for "direct intent" torts. 87 Ohio St.3d at 283, 720 N.E.2d 495. The court again emphasized that "an intent to injure, not merely an intentional act, is a necessary element to uninsurability." Id. In addition, the court explained:

{¶ 42} "In very limited instances, this court has held that the intent to injure can be inferred as a matter of law under certain circumstances. In *Preferred Risk Ins. Co. v. Gill* * * *, intent to injure was inferred from the defendant's criminal conviction for aggravated murder, an essential element of which is that the perpetrator intended to cause the death. In *Gearing,* this court held that the intent to injure could be inferred from the insured's plea of guilty to charges involving the sexual molestation of minors. The court reasoned that the act and the harm are so intertwined in regard to molestation of children that to intend the act is also to intend the harm." Id. at 283–84, 720 N.E.2d 495.

{¶ 43} In *Buckeye Union,* a jury found that Buckeye Union Insurance Company had acted in bad faith by refusing to settle a claim. Id. at 281, 720 N.E.2d 495. The verdict included jury findings in interrogatories to the effect that Buckeye's conduct was motivated by "actual malice." The jury further found that Buckeye's conduct "in failing to settle the * * * [underlying] claims was motivated by actual malice" and that Buckeye's conduct "imported a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud or embracing actual intent to mislead or deceive another." Id.

{¶ 44} The Ohio Supreme Court acknowledged these jury findings. However, the court reviewed the law and concluded that intent to injure is not an elemental part of bad faith, nor is it a necessary element of actual malice. Id. at 284–86, 720 N.E.2d 495. For example, the court observed that malice " 'not only includes an intentional act, an intent to cause harm to another, but also encompasses conduct evidenced by callous and conscious disregard of the rights of another.' " Id. at 286, 720 N.E.2d 495. Since one definition of malice involved a state of mind that does not require intent to cause harm, the court held that Buckeye's bad-faith failure to settle an insurance claim could still be an insurable act. Id. In so doing, the court again stressed that intentional acts that result in injury are not necessarily "direct intent" torts. Id.

{¶ 45} Subsequently, in *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243, the Ohio Supreme Court modified its prior holdings in *Gearing* and *Cuervo* to indicate that Ohio public policy would permit "a party to obtain liability insurance coverage for negligence related to sexual molestation when that party has not committed the act of sexual molestation." Id. at syllabus. In explaining its holding, the court noted:

{¶ 46} "In *Gearing*, we then analyzed the general public policy in the context of sexual molestation claims. There, this court was asked to decide whether courts should infer intent to injure as a matter of law from the sexual abuse of a child. We held, as have the overwhelming majority of other jurisdictions, that courts should infer such intent. * * * As a result, we concluded that public policy precluded the issuance of coverage for this intentional tort." 90 Ohio St.3d at 392, 738 N.E.2d 1243.

{¶ 47} The Supreme Court went on to note that in *Gearing* [76 Ohio St.3d at 38, 665 N.E.2d 1115], it had opined:

{¶ 48} " '[S]exual abuse of children constitutes conduct so reprehensible that the General Assembly has categorized such conduct as felonious upon commission of the proscribed acts themselves[.]' * * * The express societal condemnation that animates the public policy forbidding insurance for the intentional tort of sexual molestation, however, does not exist for the tort of negligence. Many of the claims against the Diocese and Griffin [the allegedly negligent tortfeasors] sound in negligence, and to deny them coverage as an extension of this public policy would be untenable.

{¶ 49} "This is so because the intentions of the molester are immaterial to determining whether the allegedly negligent party has coverage. *Silverball Amusement, Inc. v. Utah Home Fire Ins. Co.* (W.D.Ark.1994), 842 F.Supp. 1151, 1160, affirmed (C.A.8, 1994), 33 F.3d 1476 (permitting coverage for alleged negligent hiring and supervision by an insured despite molestation by another insured) * * *. In reaching this conclusion, we find the rationale employed in *Silverball* informative. While acknowledging that jurisdictions have arrived at different conclusions as to whether alleged negligence related to sexual molestation can constitute a policy occurrence, the *Silverball* court reasoned that the intentions or expectations of the negligent insured must control the coverage determination, and not the intentions or expectations of the molester. * * * The [*Silverball* ] court explained that a contrary practice would be unreasonable, saying:

{¶ 50} " 'The ultimate effect of [those opinions denying coverage] leads to a metamorphosis in which certain negligent actions are transformed by the court into intentional actions for the purposes of deciding negligent hiring cases involving sexual abuse. Such a decision effectively dissolves the distinction

between intentional and negligent conduct, allowing the intentional act to devour the negligent act for the purpose of determining coverage. The correct method of analyzing this issue in cases with the factual setting and insurance policy provisions involved * * * would deal with each act on its own merits and recognize that employers who make negligent hiring decisions clearly do not intend the employees to inflict harm.'" *Doe*, 90 Ohio St.3d at 393–394, 738 N.E.2d 1243, quoting *Silverball*, 842 F.Supp. at 1160.

{¶ 51} The Supreme Court also noted in *Doe* that a debate existed within the court regarding whether substantial-certainty torts fall within the public policy exclusion for intentional torts. Id. at 391, 738 N.E.2d 1243, fn. 5. However, the court stressed that this question was not implicated in *Doe*. Id.

{¶ 52} Subsequently, in 2003, the Ohio Supreme Court cited a comment from Justice Cook's concurring opinion in *Buckeye Union* to the effect that "'where substantial certainty exists, intent to harm will be inferred as a matter of law.'" *Penn Traffic Co. v. AIU Ins. Co.*, 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199, at ¶ 6, quoting *Buckeye Union*, 87 Ohio St.3d at 289, 720 N.E.2d 495. However, the court was not discussing public policy in *Penn Traffic*, but was considering a certified conflict on the following issue:

{¶ 53} "[W]hether a commercial general liability insurance policy which contains an exclusion for 'bodily injury to an employee' which arises out of or in the course of employment covers an employer's liability for substantially certain intentional torts." *Penn Traffic Co.* at ¶ 4.

{¶ 54} In *Penn Traffic Co.*, the Ohio Supreme Court did not rely on the issue of "inferred intent" and did not discuss public policy. Instead, the court reviewed the content of the applicable insurance policy and an endorsement, which excluded coverage for "bodily injury intended or expected from the standpoint of the insured." As specifically defined by the endorsement, this exclusion included both deliberate-intent torts and substantial-intent torts. *Penn Traffic Co.*, 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199, at ¶ 20–24. This was a correct interpretation based on the policy language and had nothing to do with public policy. The court's comment on "inferred intent" was, therefore, dictum, and had nothing to do with the issue being decided. Thus, the latest pronouncement on public policy is *Buckeye Union*, which followed the rule set out in *Harasyn*, which distinguishes between direct-intent torts and substantial-certainty torts.

{¶ 55} The dictum in *Penn Traffic Co.* about inferred intent also deviates from prior Ohio Supreme Court decisions. Specifically, Justice Cook concurred only in the judgment in *Buckeye Union* because she believed the majority had "resurrected" the test from *Harasyn* and had relegated *Gearing* to "nothing more than an anomaly limited in application to the sexual-molestation scenario." *Buckeye Union*, 87 Ohio St.3d at 289, 720 N.E.2d 495 (Cook, J., concurring in judgment

only).  Justice Cook's comments in a concurring opinion were not the opinion of a majority of the court.

{¶ 56} Accordingly, under the most recent pronouncements of the Ohio Supreme Court that are directly on point, insurance coverage for the claims against GNFH would not be precluded by public policy, because GNFH is not the party that committed an intentional tort.  *Doe*, 90 Ohio St.3d 388, 738 N.E.2d 1243, at syllabus.  Furthermore, with regard to the claims against Hector Gonzalez, the issue becomes whether those claims should be classified as direct-intent or substantial-certainty torts.  The claims include sexual harassment; failure to use reasonable care to prevent and correct hostile-employment-environment harassment; intentional, willful, and wanton gender discrimination; active participation in gender harassment and failure to take reasonable or adequate action to stop others from engaging in gender harassment; intentional infliction of emotional distress; negligent infliction of emotional distress; physical assault; workplace retaliation; negligent hiring, training, retention, and supervision of employees; and assault and battery by means of touching, groping, and fondling, when Gonzalez knew or should have known that such conduct was offensive.

{¶ 57} Some of the allegations in the complaint involve negligent conduct, which would not involve direct intent to harm.  Moreover, the conduct that might be classified as criminal in nature, like assault, is not a direct- or specific-intent crime.  For example, some courts have held that even a conviction for felonious assault does not preclude insurance coverage because the crime, as statutorily defined, is not a specific-intent crime.  See, e.g., *Nationwide Mut. Ins. Co. v. Machniak* (1991), 74 Ohio App.3d 638, 641, 600 N.E.2d 266, in which the Eighth District Court of Appeals relied on the difference between the element of "knowingly" as used for felonious assault and "purposefully," which is used in specific-intent crimes like the aggravated murder that was involved in *Gill*.  Specific or direct intent is also not required to establish sexual imposition.  For example, R.C. 2907.06(A)(1) prohibits sexual contact when the offender knows the contact is offensive to the other person or is reckless in that regard.  Similar to the definition of malice in *Buckeye Union* (which included callous disregard rather than specific intent), recklessness is sufficient to establish sexual imposition.

{¶ 58} Based on the preceding discussion, we conclude that the trial court erred in finding that the complaint raised only direct-intent torts and that coverage was precluded for public policy reasons.  This does not necessarily mean, however, that West American had a duty to defend Gonzalez and GNFH.  That issue is governed by the policy provisions.

## III

{¶ 59} Turning now to the policy provisions, we note that West American issued three insurance policies during the course of Trader's employment. Coverage under the first policy was effective from March 17, 1999, through March 17, 2000. The second policy was effective from March 17, 2000, through March 17, 2001, and the third was effective from March 17, 2001, through March 17, 2002. The three policies contain some provisions that are identical and some provisions that are different. As a result, we will consider the coverages under each policy separately.

### A. The First Policy

{¶ 60} Policy BZW (00) 52 43 62 18 was a "Businessowners Policy" issued in March 1999. NG & G, Inc., is the named insured, and the address is listed as 1320 Archer Drive, Troy, Ohio 45373, which is the address at which Lincoln Square Restaurant was located. The declarations sheet indicates that the named insured is a corporation and that the insured's business is a restaurant.

{¶ 61} The policy contains various forms and endorsements, but the pertinent form for purposes of this case is the "Businessowners Liability Coverage Form." This form begins by noting that "throughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations."

{¶ 62} The liability-coverage form contains six sections, labeled "A" through "F." Section A discusses coverages and provides that West American will pay those sums that "the insured becomes legally obligated to pay because of 'bodily injury,' 'property damages,' 'personal injury,' or 'advertising injury' to which this insurance applies." Coverage A further states that West American will have the "right and duty to defend the insured against any 'suit' seeking those damages."

{¶ 63} Section C of the policy defines who may be an "insured" for purposes of coverage. This section states:

{¶ 64} "1. If you are designated in the Declarations as:

{¶ 65} " * * *

{¶ 66} "d. An organization other than a partnership or joint venture, or limited liability company, you are an insured. Your 'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

{¶ 67} "2. Each of the following is also an insured:

{¶ 68} "a. Your 'employees', (other than * * * your 'executive officers' if you are an organization other than a partnership, joint venture, or limited liability

company) * * * but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these 'employees' is an insured for:

"(1) 'Bodily injury' or 'personal injury':

"a. To you, * * * or to a co-'employee' while that co-'employee' is either in the course of his or her employment or performing duties related to the conduct of your business."

{¶ 69} The complaint does not specify the precise status of Gonzalez, i.e., whether he was both a shareholder and employee of GNFH, nor does it indicate the capacity in which his actions were taken. To the extent that Trader and Gonzalez could be considered "co-employees," Gonzalez would not have been an "insured" under Section C.2.a. for any claims for bodily injury or personal injury to Trader that arose between March 1999 and March 2000, because those injuries arose during the course of Trader's employment.

{¶ 70} To the extent that Gonzalez is considered an "executive officer" or "director," he could be considered an insured under Section C.1.d., but only with regard to his duties as an officer or director. As we said, the complaint does not specify the precise capacity in which Gonzalez was acting at the time of the alleged injuries. At a minimum, however, it is at least arguable that Gonzalez was acting within the scope of his duties as a corporate officer when he managed the restaurant.

{¶ 71} Under Section C.1.d., GNFH would also be an "insured." In this regard, we agree with the trial court that West American is estopped from denying that GNFH is an "insured" under the policy. The undisputed evidence below, including the affidavit of Hector Gonzalez, indicates that GNFH should have been listed as a named insured on the policy. Under Section A.1.b., the policy states:

{¶ 72} "[T]his insurance applies:

{¶ 73} "(1) To 'bodily injury' and 'property damage' only if:

{¶ 74} "(a) the bodily injury or property damage is caused by an 'occurrence' that takes place in the coverage territory; and

{¶ 75} "(b) the 'bodily injury' or 'property damage' occurs during the policy period.

{¶ 76} "(2) To:

{¶ 77} "(a) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by you or for you."

{¶ 78} Under the definitions found in Section F, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

{¶ 79} Section B of the liability coverage form contains exclusions from coverage. Among the items excluded is "bodily injury" to employees of the insured, arising out of and in the course of their employment. Under this exclusion, any bodily injury claims brought against Gonzalez, as a director or officer, or against GNFH would have been excluded from coverage.

{¶ 80} The policy also contains an endorsement entitled "Employment–Related Practices Exclusion." This endorsement modified the policy and added the following exclusion, which states:

{¶ 81} "This insurance does not apply to:

{¶ 82} "1. 'Bodily injury' or 'personal injury' to:

{¶ 83} "a. A person arising out of any:

"(1) Refusal to employ that person;

"(2) Termination of that person's employment; or

"(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or other discrimination directed at that person; or

{¶ 84} "b. The spouse, child, parent, brother, or sister of that person as a consequence of 'bodily injury' or 'personal injury' to that person at whom any of the employment-related practices described in paragraphs (1), (2), or (3) above is directed.

{¶ 85} "This exclusion applies:

{¶ 86} "a. Whether the insured may be liable as an employer or in any other capacity;

{¶ 87} "b. To any obligation to share damages with or repay someone else who must pay damages because of the injury."

{¶ 88} We conclude that the wording of this endorsement also excluded coverage for Trader's personal injury claims or claims that were based on employment practices, including claims for negligent hiring and supervision. Accordingly, West American had no duty to defend GNFH or Hector Gonzalez for any claims that arose between March 1999 and March 2000.

## B. The Second Policy

{¶ 89} The second policy contains provisions identical to the provisions that we have quoted from the first policy, including the "Employment–Related Practices Exclusion." However, the second policy also contained a "Stop–Gap Liability

Ohio" endorsement that modified the Businessowners Liability Coverage Form. The Stop–Gap endorsement is four pages long and contains its own insuring agreement and exclusions. Under "Coverage Y—Stop Gap Liability," West American stated as follows:

{¶ 90} "1. Insuring Agreement

{¶ 91} "a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' to or 'occupational disease' of an employee to which this insurance applies. We have the right and duty to defend any 'suit' seeking those damages. However, we will have no duty to defend any 'suit' seeking damages which are not covered by this endorsement. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

{¶ 92} "b. For damages to be covered by this endorsement, the 'bodily injury' or 'occupational disease' must be due to conduct which occurs during the course of employment by you; and your employee must be declared and covered under the Workers' Compensation law(s) of the State of Ohio.

{¶ 93} "c. The 'bodily injury' to your employee must occur within the 'coverage territory' and during the policy period.

{¶ 94} "d. The 'bodily injury' to your employee must be caused or aggravated by conditions occurring during the course of employment. The employee's last day of exposure to the condition causing or aggravating such 'occupational disease' must be during the policy period.

{¶ 95} "e. Damages because of 'bodily injury' or 'occupational disease' include:

{¶ 96} "(1) Damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury' or 'occupational disease'; and

{¶ 97} "(2) Damages for which you are liable by reason of 'suits' or claims against you by others to recover damages obtained from such others due to 'bodily injury' or 'occupational disease' sustained by your employees and due to conduct which occurs during the course of their employment by you; and

{¶ 98} "(3) Damages claimed for any 'bodily injury' or 'occupational disease' which is substantially certain to occur but not directly intended by you.

{¶ 99} "2. Exclusions

{¶ 100} "This insurance does not apply to:

{¶ 101} "h. To punitive or exemplary damages:

" * * *

"(3) With respect to any 'bodily injury' or 'occupational disease' caused by an employer's intentional tort, regardless of whether such 'bodily injury' or 'occupational disease' was directly intended or substantially certain to occur.

{¶ 102} " * * *

{¶ 103} "1. Any 'bodily injury' or 'occupational disease' directly intended or caused as a result of an act or omission committed by:

{¶ 104} "(1) You or at your direction; or

{¶ 105} "(2) Any of your executive officers, directors, stockholders or partners, if you are designated in the Declarations of this policy as any legal entity other than a proprietorship.

{¶ 106} "m. Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, retaliation against or termination of any employee, or any personal practices, policies, acts or omissions.

{¶ 107} " * * *

{¶ 108} "q. 'Bodily injury' or 'occupational disease' directly intended and caused by an employer's intentional tort. This exclusion does not apply to 'bodily injury' or 'occupational disease' alleged or determined to be substantially certain to occur as a result of an employer's intentional tort."

{¶ 109} This policy defines "bodily injury" as "[b]odily injury, incidental medical malpractice injury, sickness or disease sustained by a person, and includes mental anguish resulting from any of these."

{¶ 110} The Stop–Gap endorsement clearly indicates an intent to cover damages for bodily injury, including mental anguish, to employees, that is alleged or is determined to be substantially certain to occur as the result of an employer's intentional tort. Notably, the Stop–Gap is careful to distinguish between this type of situation and one in which an injury is "directly intended." This is consistent with the line of cases we have discussed that distinguish between "substantial certainty" and "direct intent" torts.

{¶ 111} Upon consideration, we conclude that West American had a duty to defend Hector Gonzalez with regard to the bodily injury claims that were alleged to be the result of physical assault and battery. As we noted, providing for such insurance is not against public policy, and some courts have not precluded coverage even where the insured has been convicted of a crime. See, e.g., *Nationwide Mut. Ins. Co. v. Machniak* (1991), 74 Ohio App.3d 638, 641, 600 N.E.2d 266 (felonious-assault conviction does not affirmatively establish intent to harm for purposes of insurance coverage).

{¶ 112} We have previously stressed the general presumption that arises in connection with insurance contracts. Specifically, an item not "clearly excluded from the operation of such contract is included in the operation thereof." *WAS, Inc. v. Alea London, Ltd.*, 161 Ohio App.3d 111, 2005-Ohio-2533, 829 N.E.2d 727, at ¶ 9 (holding that coverage arguably existed under an insurance policy for claims against an employer and employees for an alleged assault and battery of bar patrons, and that the insurer had a duty to defend).

{¶ 113} The exclusions from coverage in the West American policies are extensive and detailed. However, while other insurance policies have explicitly excluded assault and battery, West American's policy failed to do so. Cf. *Colter v. Spanky's Doll House*, Montgomery App. No. 21111, 2006-Ohio-408, 2006 WL 235045, at ¶ 11–25 (outlining policy provisions that specifically exclude coverage for any assault or battery, as well as claims for negligent hiring, training, supervision, and retention).

{¶ 114} The duty to defend is also not precluded by the fact that the second policy contained the Employment Practices Exclusion as well as exclusion "m" under the Stop–Gap for "damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, retaliation against or termination of any employee, or any personal practices, policies, acts or omissions." Even if the allegations pertaining to assault and battery were considered under the category of employment practices or omissions, these provisions contradict each other. Logically, the Stop–Gap endorsement could not provide coverage for damages for an employee's bodily injury based on an employer's intentional tort and then exclude coverage for damages for the same thing. As we have stressed before, ambiguities in polices are to be construed in favor of the insured, and policy provisions should be construed, if possible, in harmony. *WAS, Inc.*, 161 Ohio App.3d 111, 2005-Ohio-2533, 829 N.E.2d 727, at ¶ 9.

{¶ 115} Notably, a claim for assault and battery could have been established independent of a hostile-work-environment claim based on sexual harassment. In other words, no physical contact or injury is required to establish a hostile-work-environment claim. By the same token, the fact of a physical battery or assault does not mean that a plaintiff will recover on a hostile-work-environment claim. To prevail on such a claim, the plaintiff must show:

{¶ 116} " '(1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) [the employer] "knew or should have known of the charged sexual harassment and failed to implement prompt and appropri-

ate corrective action." ' " *Valentine–Johnson v. Roche* (C.A.6, 2004), 386 F.3d 800, 813–814, quoting *Blankenship v. Parke Care Ctrs., Inc.* (C.A.6, 1997), 123 F.3d 868, 872, quoting *Rabidue v. Osceola Refining Co.* (C.A.6, 1986), 805 F.2d 611, 621.

{¶ 117} Ohio follows the same standard, except that plaintiffs do not have to show membership in a protected class, because both sexes are entitled to protection under R.C. 4112.02(A). *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 176–177, 729 N.E.2d 726, and fn. 2. In *Valentine,* the Sixth Circuit Court of Appeals stressed that sexual harassment must be sufficiently severe or pervasive to be actionable and discussed a case in which even unwelcome physical contact did not satisfy the plaintiff's burden. 386 F.3d at 813–814.

{¶ 118} Based on the preceding discussion, we conclude that the allegations in the complaint raise a duty to defend Hector Gonzalez on allegations of bodily injury resulting from physical assault and battery. They also raise a duty to defend GNFH, because GNFH was potentially liable for the assault under theories of vicarious liability for and ratification of its employees' intentional acts. *Amato v. Heinika Ltd.,* Cuyahoga App. No. 84479, 2005-Ohio-189, 2005 WL 110441, at ¶ 15–18, and *Wells v. Bowie* (1993), 87 Ohio App.3d 730, 738, 622 N.E.2d 1170 (reversing summary judgment on issue of whether an employer, knowing of employee's alleged misconduct, facilitated it by failing to act after receiving reports of improper acts).

{¶ 119} An employer may be liable for the wrongful acts of its employees if the employees are acting within the scope of employment. The employer may also be liable if the employee is acting outside the scope of employment, when the employer has the knowledge and ability to control that person. See, e.g., *Tarver v. Calex Corp.* (1998), 125 Ohio App.3d 468, 484, 708 N.E.2d 1041. Further, an employer can additionally be held liable when the employee was acting outside the scope of the employment relationship and was aided in accomplishing the tort by the existence of the agency relationship. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 332, 587 N.E.2d 825. Typically, these are factual questions to be decided by the jury. 63 Ohio St.3d at 334, 587 N.E.2d 825.

{¶ 120} Theories of vicarious liability and ratification were raised in Count 13 of Trader's complaint. Because GNFH was potentially liable for the physical assaults and battery to Trader, West American also owed GNFH a duty of defense. This does not mean that West American was responsible for indemnifying Hector Gonzalez or GNFH, as the duty to defend is broader than the duty to

indemnify. In addition, GNFH and Gonzalez have not asked for a declaration that West American was required to indemnify them for Trader's claims.

{¶ 121} Based on the preceding discussion, the trial court erred in finding that no duty to defend existed under the West American policy that was effective between March 17, 2000, and March 17, 2001.

## IV

{¶ 122} The third policy was effective between March 2001 and March 2002 and is identical in most pertinent respects to the first policy. This policy contains the exclusion for bodily injuries to employees arising from employment, and also contains the Employment Related Practices Exclusion. However, like the second policy, this policy includes a Stop–Gap liability endorsement covering bodily injury to employees. This does not automatically mean that coverage existed, because there are differences in the wording of the two Stop–Gap endorsements.

{¶ 123} The insuring agreement in the Stop–Gap for the third policy states that West American "will pay those sums that the insured becomes obligated by Ohio Law to pay as damages because of 'bodily injury by accident' or 'bodily injury by disease' to which this insurance applies. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury by accident' or 'bodily injury by disease' to which this insurance does not apply. We may, at our discretion, investigate and settle any claim."

{¶ 124} Under the "Exclusions" section, the Stop–Gap states that the insurance does not apply to:

{¶ 125} "e. Intentional Injury

{¶ 126} " 'Bodily injury' expected or intended from the standpoint of any insured.

{¶ 127} "f. Employee Practices

{¶ 128} "Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions."

{¶ 129} In *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 193, 569 N.E.2d 906, the Ohio Supreme Court held that "in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional."

{¶ 130} We previously addressed a similar policy provision in *Talbert v. Continental Cas. Co.*, 157 Ohio App.3d 469, 2004-Ohio-2608, 811 N.E.2d 1169.

The policy in *Talbert* provided coverage for "loss resulting from an occurrence during the Policy Period because of the Insured's legal liability for damages arising out of bodily injury or occupational disease sustained by employees." The policy defined an occurrence as "an accident." Id. at ¶ 27, 32. The policy in *Talbert* did not contain the phrase "expected or intended," but contained an exclusion for bodily injury "intentionally caused" by the insured. Id. at ¶ 38.

{¶ 131} On appeal, the insurer, Continental Insurance, argued that we should uphold the trial court's grant of summary judgment because the injury resulted from a substantial-certainty intentional tort, which the insurer contended could not be an "occurrence" that was defined as an "accident." Id. at ¶ 35. In responding to this argument, we stated:

{¶ 132} "[W]e are struck by the fact that if Continental's interpretation is correct, Amcast [the employer] would have purchased nothing when it purchased this policy from Continental. Unlike *Gearing, Penn Traffic, Swanson,* or *Preferred Risk,* the policy at issue in this case was not a general homeowner's policy or a commercial general liability policy wherein an insured was arguing for coverage based on just one provision in an otherwise comprehensive policy. The only thing that the Continental insurance policy asserts to cover is those injuries to Amcast's employees arising out of their employment with Amcast that is not covered by the workers' compensation system. In Ohio, the only injuries that would not be covered by workers' compensation are intentional torts and, pursuant to *Harasyn,* the only intentional tort that one can insure against without violating Ohio public policy is substantial-certainty intentional torts. Thus, the only thing the Continental policy would provide coverage for was substantial-certainty intentional torts. Yet, Continental now argues that even these are not covered under its policy. The only thing Continental argues that would be covered under the policy is 'dual capacity torts.' However, the *Harasyn* court addressed this argument and found it to be specious. *Harasyn,* supra. We find that Continental's argument would render its policy illusory. Like the courts in *Harasyn* and *Miller* [*Miller v. Midwestern Indemn. Co.* (Feb. 23, 1996), Montgomery App. No. 15360, 1996 WL 397450]:

{¶ 133} "[W]e are not inclined to give the insurance policy a reading that would render it useless. Amcast paid a significant premium for this policy, and we fail to see what it paid for if it was not coverage for substantial-certainty intentional torts." *Talbert,* 157 Ohio App.3d 469, 2004-Ohio-2608, 811 N.E.2d 1169, at ¶ 36.

{¶ 134} We still agree with this statement. The appellants in the present case have specifically raised the point in their brief that the Stop–Gap endorsement is illusory if coverage is excluded for both types of intentional tort. We agree with this contention. We have read the Stop–Gap endorsement a number of times and

fail to see what coverage could possibly exist if both direct-intent and substantial-certainty torts are excluded.

{¶ 135} In a case decided before *Talbert,* the Tenth District Court of Appeals held that the proscription against coverage for any bodily injury "expected or intended" was tantamount to the policy language in *Penn Traffic,* which had expressly excluded coverage for substantial certainty torts. *Altvater v. Ohio Cas. Ins.,* Franklin App. No. 02AP–422, 2003-Ohio-4758, 2003 WL 22077728, at ¶ 16. As we noted earlier, the Ohio Supreme Court commented, as dictum, in *Penn Traffic,* that "where substantial certainty exists, intent to harm will be inferred as a matter of law." *Penn Traffic,* 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199, at ¶ 6.

{¶ 136} In *Altvater,* the Tenth District acknowledged that the Ohio Supreme Court's comment in *Penn Traffic* about "inferred intent to harm" was not necessary to the Supreme Court's decision. 2003-Ohio-4758, 2003 WL 22077728 at ¶ 15. Nonetheless, the Tenth District concluded that intent to harm would be inferred where a jury had found that the employer knew that harm to the injured employee was substantially certain to occur. Id. at ¶ 16. The Tenth District, therefore, held that the employee's bodily injury could not be considered an "occurrence" for purposes of the involved insurance policies because the injury was "expected and intended." Id.

{¶ 137} As we indicated previously, we do not disagree with the Ohio Supreme Court's decision in *Penn Traffic,* due to the policy language involved in that case, which expressly excluded both "direct intent" torts and "substantial certainty" torts by reciting legally established definitions of those terms. However, we also stressed earlier that the Ohio Supreme Court did not need to consider or rely on "inferred intent" because the policy in question explicitly excluded both "direct intent" and "substantial certainty" torts.

{¶ 138} In *Penn Traffic,* the Ohio Supreme Court did not consider whether the lack of coverage would render the insurance illusory. Likewise, the Tenth District did not consider this point in *Altvater.*

{¶ 139} The Eighth District Court of Appeals has agreed with *Altvater'*s rejection of insurance coverage for intentional torts when the policy excludes bodily injury "expected or intended" by an insured. *McGuffin v. Zaremba Contracting,* 166 Ohio App.3d 142, 146–147, 2006-Ohio-1734, 849 N.E.2d 315, at ¶ 17. *McGuffin* did not analyze any changes in the law, but relied on a 1995 decision of the Eighth District. Id. at ¶ 15. *McGuffin* also did not consider whether its holding rendered the insurance illusory.

{¶ 140} The policies at issue in *Altvater* and *McGuffin* were not "Stop–Gap" policies, but were commercial general liability policies, multi-peril policies, and

commercial umbrella policies.  *Altvater,* 2003-Ohio-4758, 2003 WL 22077728, at ¶ 2–3, and *McGuffin,* 166 Ohio App.3d 142, 2006-Ohio-1734, 849 N.E.2d 315, at ¶ 3.  In contrast, the only purpose of the Stop–Gap Liability endorsement in the present case is to provide coverage for an employer's liability for bodily injuries to employees.  That purpose is defeated if the provisions are interpreted to exclude coverage for both "direct intent" and "substantial certainty" intentional torts.  Because there would be nothing left to cover, we are unable to ascertain any logical reason for adding the endorsement to the policy.

{¶ 141} Accordingly, in the absence of an explanation why the insurance coverage offered in the endorsement is anything but illusory, we conclude that the exclusion for "expected" injuries does not bar coverage for the alleged intentional torts in the present case.

{¶ 142} We also note that the endorsement defines an accident as an "unintended happening."  It does not provide that an accident is an "unexpected or unintended happening."  The terms "expect" and "intend" are not synonymous.  For example, "expect" is defined as "to look forward * * * suppose, think, believe * * * to consider probable or certain."  Webster's Third New International Dictionary (1981) 799.  In contrast, "intend" is defined as "to have in mind as a design or purpose * * * plan * * * to have in mind as an object to be gained or achieved."  Id. at 1175.  At the least, this renders the endorsement ambiguous.  This is an additional point of distinction from *Penn Traffic, Altvater,* and *McGuffin.*

{¶ 143} For the reasons expressed in connection with the second policy's coverage and exclusions, we hold that West American had a duty to defend both Hector Gonzalez and GNFH with regard to the allegations in the complaint based on bodily injury arising from physical assaults and battery.

{¶ 144} As a final matter, we note that appellants have argued that West American should be estopped from denying coverage because it defended other parties who were insured under the contract.  The trial court observed that this argument was tempting for its simplicity.  However, the trial court declined to address the issue because appellants had failed to specifically plead the matter.  We disagree with the trial court, as appellants did raise the issue of estoppel in their response to the counterclaim for declaratory judgment filed by West American.  However, we find the estoppel argument to be without merit.  As a general matter, "the doctrine of waiver cannot be employed to extend the coverage of a policy."  *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 668, 597 N.E.2d 1096.  Waiver and estoppel can affect whether coverage will be found in certain instances, such as when an insurer has waived

timely notice of a claim, but waiver and estoppel cannot define the basic scope of coverage. Id.

{¶ 145} In the present case, West American defended several parties under a reservation of rights. This action did not prevent West American from denying a duty to defend other parties. However, as we said, West American was mistaken in rejecting the duty of defense. Accordingly, the trial court erred in finding that there was no duty to defend Gonzalez and GNFH.

{¶ 146} Based on the preceding discussion, the Gonzalezes and GNFH's sole assignment of error is sustained.

V

{¶ 147} The Gonzalezes and GNFH's sole assignment of error having been sustained, the summary judgment rendered in favor of West American Insurance Company and Ohio Casualty Insurance Company is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BROGAN and GRADY, JJ., concur.