[Cite as *Clark v. Harmon*, 2012-Ohio-6041.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

REBECCA B. CLARK, et al.       :

                                 :       Appellate Case No. 25030

      Plaintiff-Appellant       :

                                 :       Trial Court Case No. 09-CV-767

v.                            :

                                 :

SEAN HARMON, et al.        :       (Civil Appeal from

                                 :        Common Pleas Court)

      Defendant-Appellee     :

                                 :

. . . . . . . . . . .

### O P I N I O N

Rendered on the 21st day of December, 2012.

. . . . . . . . . . .

GEOFFREY P. DAMON, Atty. Reg. #0029397, 214 East Ninth Street, 5th Floor, Cincinnati, Ohio 45202
      Attorney for Plaintiff-Appellant

RICHARD S. WAYNE, Atty. Reg. #0022390, and STEPHEN E. SCHILLING, Atty. Reg. #0086897, 150 East Fourth Street, Cincinnati, Ohio 45202
      Attorney for Defendant-Appellee

. . . . . . . . . . . .

FAIN, J.

{¶ 1}    Plaintiffs-appellants Rebecca Clark, Kevin Clark, and Clark Real Estate

Investment (collectively, "the Clarks"), appeal from a summary judgment rendered in

favor of defendants-appellees Sean Harmon, John Stachler, and Martin, Folino, Harmon & Stachler, LPA. The Clarks contend that they submitted sufficient evidence to establish a prima facie case of professional negligence against the defendants. The Clarks further contend that the trial court failed to view the evidence in their favor and erroneously applied summary judgment standards.

{¶ 2} We conclude that the trial court erred in rendering summary judgment in favor of the defendants. Genuine issues of material fact exist regarding the attorneys' failure to perform due diligence regarding the sale of the Clarks' business, and failure to have advised the Clarks of the risk of proceeding with a sale on terms that included a substantial, unsecured, unpaid balance of the selling price. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

### I. The Clarks Sell Their Business, Retaining Harmon
### as Their Lawyer in Connection with the Sale

{¶ 3} The evidence, viewed in a light most favorable to the Clarks – the parties responding to the motion for summary judgment – is as follows. Kevin Clark is a high school graduate and has had little formal business training. Rebecca Clark, Kevin's wife, attended community college for two semesters, taking general education courses, and eventually became a barber. Kevin started a carpet-cleaning business called American Carpet Masters ("ACM") in 1986, with a few portable machines. In 1993, Kevin expanded the business to include water damage, and also incorporated.

{¶ 4} After the business was incorporated, Kevin was responsible for the

day-to-day operations, including purchasing decisions, advertising, and management of employees. Rebecca began by answering telephones and scheduling appointments, and began doing more bookkeeping as the business grew. Rebecca took care of making deposits and kept track of payables and receivables. ACM did not have a company attorney; beginning around 2000 and continuing thereafter, ACM used Martin, Folino, Harmon & Stachler, LPA ("MFH&S") for some collection matters.

{¶ 5} ACM increased sales every year in its history, except after 9/11/2001, when sales for the year stayed the same or decreased a small amount. After that, sales continued to increase until the business was sold. Beginning around 2003, Kevin and Rebecca began to discuss selling the business. Kevin obtained an appraisal in 2004, which valued the business at around $650,000. However, Kevin then streamlined the business, automating it and increasing sales by a substantial amount.

{¶ 6} In 2005, Kevin made a list of potential buyers and contacted several companies, including Widmer's, which turned out to be owned by Zoots. Jim Olmstead of Widmer's was Kevin's initial contact. In 2005, ACM's gross sales were about $900,000. Olmstead indicated that Zoots/Widmer's was seriously interested, and a meeting was arranged. Olmstead came to ACM on several occasions to monitor the operation. Eventually, however, Zoots did not make an offer. Zoots had another deal on the table with a company called Security Amirkhanian, and indicated it would come back to ACM at some point.

{¶ 7} By April 2006, Kevin and Rebecca had decided not to sell their company. They built a home and relocated their physical office there, with the intention of focusing on

equipment and warehouse space rather than office space. Revenues increased in 2006. In September 2006, Zoots contacted the Clarks and indicated it wanted to purchase ACM. On behalf of Zoots, Kyle Gendreau offered to purchase ACM on September 19, 2006, for $700,000, with $500,000 due at closing and an additional $200,000 to be paid quarterly over a two-year period, at 6% interest. The Clarks rejected that offer.

{¶ 8} Subsequently, Gendreau and Jim McManus, the CEO of Zoots, flew to Dayton and had lunch with the Clarks. An offer was then made of a $900,000 purchase price. The parties also discussed Zoots' paying $500,000 up front, with the rest being paid over 36 months at 6% interest. The Clarks agreed orally to take $900,000, with $500,000 up front, and to take the rest of the cash over a time period. Anything beyond this oral agreement was what the Clarks hired their attorney to do. The Clarks consulted the MFH&S firm because the firm was local and had represented them previously in a collection matter. Their attorney was Sean Harmon.

{¶ 9} The minutes of a special meeting of the shareholders and directors of ACM, dated September 30, 2006, indicates that the shareholders and directors of ACM had met that day and had authorized ACM to approve the sale of the equipment, intangibles and other operating assets "pursuant to the provisions of the Asset Purchase Agreement" attached to the minutes. Rebecca Clark Deposition, p. 74, and Ex. 20 attached to the Rebecca Clark Deposition, p. 1. The precise date on which the Clarks first contacted Harmon is disputed, but there is no dispute that this document was prepared at Sean Harmon's office and was signed after the Clarks had met with Harmon. According to Rebecca Clark, Harmon asked if they had a meeting of the shareholders, and Rebecca said no. Harmon then left the room and

returned with the document regarding the special meeting and the authorization to enter into the asset purchase agreement.   Rebecca Clark deposition, pp. 75-77 and 80-81.   When the document was signed, Rebecca Clark had not seen a detailed asset purchase agreement or a note.   *Id.* at 77.   In fact, correspondence between Harmon and the attorney for Zoots indicates that on October 5, 2006, Zoots sent Harmon a "clean *and marked* copy of the revised Purchase Agreement" and indicated that "[t]he blacklined copy show our changes to the last version."   Harmon Deposition, pp. 18-19, and Exhibit C attached to the Harmon Deposition, p. 2. (Emphasis sic.)    Zoots also sent Harmon a "clean *and marked* copy of the revised Note" on the same date.   *Id.* (Emphasis sic.)

{¶ 10}    The e-mail from the attorney for Zoots further indicates:

Finally, please note that Kyle/Zoots has not had the chance to review the attached documents – and, therefore, we must reserve the right to make further changes.   That said, we believe that the documents are in substantially final form – and we'd like to focus on the open/diligence/closing items.   Exhibit C, pp. 2-3.

{¶ 11}    Among other things, the items referred to in the e-mail are non-compete provisions for ACM employees and how ACM intended to approach a payoff letter and/or lien release issues.   *Id.* at 3.

{¶ 12}    An e-mail from Zoots's attorney, dated October 10, 2006, encloses further revisions to the purchase agreement and note.   In this regard, the e-mail states:

·   Purchase Agreement.   We've attached a clean and *marked* copy of the revised Purchase Agreement. The blacklined copy show our changes to the last version.    As requested, we've capped certain reps and warranties, changed the

governing law to Ohio, and included a 30-day cure period for the setoff. I've also suggested a geographical limitation on the noncompete. My client hasn't seen this language, but let's discuss.

· Note. We've attached a clean and *marked* copy of the revised Note, which uses Ohio law as requested.

· Bill of Sale. As requested, the attached version uses Ohio law.

· Schedules. I'll send you a revised set of schedules tonight under separate cover. Exhibit C, p. 2. (Emphasis sic.)

**{¶ 13}** Thus, while the Clarks had accepted a purchase price, no written documents had been signed, and substantial negotiation and revisions occurred after they saw Harmon. Prior to consulting Harmon, the Clarks had not obtained any financial documents from Zoots.

**{¶ 14}** The scope of Harmon's legal representation of the Clarks is in dispute. Harmon testified that he did not advise the Clarks about whether they should go through with the deal, because that was never an issue. According to Harmon, "Kevin was very clear that the deal, as far as he was concerned, was done, and that it was my job to close it." Harmon Deposition, p. 18. In contrast, the Clarks testified that they were not trained in business matters and did not ask Zoots for financial information. They expected their lawyer to do that and to protect their interests in the sale. They told their attorney that they had not obtained financial information and the attorney did not advise them to obtain such information. Both the Clarks also testified that they did not have a deadline for closing when they went to Harmon, that they were not under pressure to close the deal, and that they would have followed Harmon's advice if he had told them to delay the closing to obtain financial

information or if he had told them to walk away from the deal.

{¶ 15} Harmon did not conduct any investigation of Zoots's financial situation, nor did he tell the Clarks that there was insufficient time to do an appropriate job on the sale. Harmon testified that he did discuss with Zoots's attorney the requirement of obtaining security for the note, but could not recall if he discussed security with the Clarks.

{¶ 16} The closing occurred on October 12, 2006, without any financial investigation of Zoots having been made. The Clarks received a down-payment of $500,000, and an unsecured promissory note from Zoots for $400,000. The note carried 6% interest, was payable in 36 monthly installments, and could be accelerated, among other things, by Zoots's failure to make any payment required within 90 days after receiving written notice of delinquency. The agreement also contained a five-year non-competition provision, precluding the Clarks from engaging in "carpet and upholstery cleaning, dry cleaning, laundry services, flood and water restoration services, and residential and/or business pick-up delivery routes * * * anywhere in the State of Ohio, Kentucky and Indiana and other geographical areas served by" Zoots. Exhibit 20 attached to the Kevin Clark Deposition, Section 4.6, p. 12.

{¶ 17} Harmon charged the Clarks about $5,745, plus expenses, for his work on the transaction. The bill did not list specific dates or hourly amounts for any items, including the initial consultation, but simply listed the amount for total services rendered through October 18, 2006.

{¶ 18} Following the closing, Zoots was late with its second payment, which was supposed to be paid in November 2006. The Clarks contacted Harmon, and he indicated that Zoots would have to be 90 days late before anything could be done. In July 2007, the Clarks

contacted Harmon about late payments and he again made the same comment. Harmon did write a letter to the attorney for Zoots, complaining about late payments. The Clarks then received two payments, which brought the account current.

{¶ 19}    However, Zoots stopped making payments in September 2007. The Clarks contacted Harmon again in October 2007, regarding the late payments, and Harmon sent Zoots a certified mail notice regarding the default. Zoots received the notice in late October 2007, but failed to make further payment. Consequently, the total principal amount of $277,777, plus costs and interest, became due in late January 2008. Harmon's bill indicates that he filed a complaint against Zoots on the promissory note in January 2008, filed an amended complaint in March 2008, and obtained a default judgment against Zoots in late April 2008. For these services, Harmon charged a total of approximately $3,840 for attorney fees and costs through May 20, 2008.

{¶ 20}    Zoots filed for involuntary bankruptcy in July 2008, and the petition was dismissed and converted to a liquidation. MFH&S submitted the default judgment to the liquidating trustee in July 2008. Zoots had apparently executed an "ABC" agreement in April 2008, which provided for a liquidating trust of the company's remaining assets, transfer of all assets to the trust, and payment of claims according to priorities in the Bankruptcy Code. Due to the amount of the secured claims, there were no funds available to pay the Clarks' claim. Through a lending relationship beginning in 2005, Zoots had borrowed about $15.2 million from NewStar Financial, Inc., which was secured by a lien on "substantially all" of Zoots's assets. Docket #34, Exhibit A, p. 2. There was also a junior lien of "substantially all" of the assets, of about $3.6 million. *Id.* There is no specific indication of when this

latter loan occurred, or what the specific status of either loan and the respective assets of Zoots was in September 2006, when the Clarks sold their business to Zoots.

{¶ 21}   When the assets of Zoots were transferred to the ABC trust in April 2008, the secured lenders had a total of about $6.6 million in deficiency claims.  *Id*.   In addition, there was a total of about $11,100,000 in priority unsecured debts and non-priority unsecured debts.  *Id.*

## II.   The Course of Proceedings

{¶ 22}    In January 2009, the Clarks brought this action against Stachler, Harmon, and MFH&S, alleging breach of contract, negligence, and breach of fiduciary duty.   After a motion to dismiss the complaint was overruled, the defendants filed a motion for summary judgment.   The motion was based on these contentions: (1) even if the Clarks had obtained a security interest, they would not have been paid, because their interest would have been subordinated to senior secured lenders; (2) Harmon's alleged failure to have exercised due diligence would not have mattered, because the undisputed evidence is that Zoots was financially stable and secure in September 2006; (3) plaintiffs had been working with Zoots and knew its financial strength; and (4) the Clarks received a total of approximately $641,184.79 before the  financial collapse of business markets in the United States, which could not have been predicted in September 2006.

{¶ 23}    The Clarks responded with affidavits setting forth the facts set forth in Part I, above. They also presented testimony from an attorney experienced in small business and commercial transactions, who stated that the defendants had failed to comply with accepted

standards for reasonably competent business attorneys by failing to do any investigation or due diligence regarding the buyer or its finances, by failing to obtain a security interest in the assets to be sold to the buyer, and by failing to advise the Clarks of the consequences of the failure to obtain a security interest.

{¶ 24} The trial court rendered summary judgment in favor of defendants. The court concluded that even if the Clarks had obtained a security interest, they would not have realized any money in the bankruptcy. In addition, the court concluded that there was insufficient time to perform due diligence. Furthermore, even if due diligence had been done, it would have shown that Zoots had trimmed its losses and was projecting substantial increases in the next few years. The court concluded that the primary reason the Clarks lost their profit was due to the 2008 financial collapse, which hurt most people in the country.

{¶ 25} The Clarks appeal from the summary judgment rendered in favor of defendants.

### III. There Are Genuine Issues of Material Fact
### Concerning the Legal Malpractice Claims

{¶ 26} The Clarks's First Assignment of Error is as follows:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

{¶ 27} Under this assignment of error, the Clarks contend that they submitted sufficient evidence to establish a prima facie case of professional negligence, and that the trial court, therefore, erred in rendering summary judgment against them.

{¶ 28} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999). "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.)

{¶ 29} To establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall*, 77 Ohio St.3d 421, 422, 674 N.E.2d 1164 (1997), syllabus.

{¶ 30} After reviewing the evidence the record, we find various disputes of fact that preclude summary judgment. The disputes are as follows:

## A. Scope of Representation

{¶ 31} There is a factual dispute regarding the scope of representation. Harmon contends he was retained only to prepare closing documents; in contrast, the Clarks maintain that Harmon was hired to perform due diligence and to protect their interests with respect to the sale, which would have included giving them information about whether proceeding with the sale was prudent.

## B. Duty to Advise the Clarks About the Lack of Security

## for the Unpaid Purchase Price

{¶ 32} In concluding that obtaining a security interest would have been a futile act, the trial court relied on information from the trustee for the ABC trust, who stated, "based on information supplied" to him and his "administration of the trust," Zoots's lenders would never have agreed to subordinate their priority interest to unsecured debt. This statement does not establish a "fact." The trustee would have been dealing with creditors after-the-fact, not back in 2006, when the Clark transaction occurred, and his testimony does not indicate the specific time-frame to which he is referring. Also, whatever the trustee was "told" by various unnamed parties or witnesses are out-of-court statements offered for their truth, and the statements are not admissible to establish anything. *See* Evid. R. 801(C) and 802. It may well be that lenders would not have agreed, but the method the defendants have chosen is not the proper way to prove this fact.

{¶ 33} The trial court also relied on an affidavit from an attorney who handled a similar sale for a seller in 2007. The attorney indicated that he had tried to get Zoots to provide security, but Zoots indicated it would not provide security for the notes it was issuing in connection with its purchase of dry-cleaning companies. Putting aside the fact that the transaction was later in time, thus lessening its potential relevance, the information provides some evidence that Zoots would have refused to agree to provide security to the Clarks. However, it does not release the attorneys from an obligation to: (1) inquire about security; (2) inform the client of the seller's refusal to provide security; and (3) inform the client of the potential consequences of taking an unsecured promissory note for a sizeable debt. Had the

Clarks been advised of the risk posed by the unsecured unpaid balance of the purchase price, they could have chosen to walk away from the transaction and continue operating their business.

### C.   Issues Regarding Due Diligence

**{¶ 34}**   In concluding that due diligence would have shown a stable company, the trial court relied on a "case study" submitted by defendants.   The case study was prepared for the use of classes at Harvard Business School ("HBS") by Todd Krasnow, one of the founders of Zoots.   Krasnow was an "entrepreneur in residence" at HBS in January 2007.   *See* Affidavit of Todd Krasnow, attached as Exhibit 2 to Docket #55.

**{¶ 35}**   The "facts" in the case study itself are of questionable validity, given that Krasnow's affidavit states only that "[t]o the best of my knowledge and belief the financial information contained in Exhibits 1b-2c and 5 comes from the records of the financial information of Zoots and *substantially reflects* the trends."   Ex. 2, ¶ 5.   (Emphasis added). This is not a statement that the facts are true; it is a statement about "trends."   Furthermore, a footnote on page 1 of the case study says that "HBS cases are developed solely as the basis for class discussion.   *Certain financial data have been disguised.*   Cases are not intended to serve as endorsements, *sources of primary data*, or illustrations of effective or ineffective management."   Docket #55, Exhibit 2(A), p. 1.   (Emphasis added.)   Thus, the study itself disclaims its evidentiary value.

**{¶ 36}**   The case study is peppered with references to financial difficulties associated with Zoots, which was founded in 1998, about eight years before the Clark purchase.   Zoots

was founded by Krasnow and by Tom Sternberg, who had founded the office supply company, Staples. Initially, the founders each provided $200,000 in seed funding, followed by another $1,000,000 each from them, and money from a few investors. Krasnow indicated that they had "expanded the business aggressively before [they] really had the business model nailed down." *Id*. at p. 1.

{¶ 37} An additional $25,000,000 was raised in 1999 to fund an aggressive growth plan that was later put on hold due to serious problems. As an explanation for the difficulties, Krasnow stated that they were "caught off guard by the complexity of managing the centralized processing facilities. As revenue grew, it became increasingly clear they were facing serious problems." Docket #55, Ex. 2(A), p. 4. The problems were numerous, including higher fixed costs of operation than had been anticipated, and the presence of some issues that appear to be inherent with the dry cleaning industry, like the fact that each garment requires individual care, and that there is no ability to "build inventory" during slow periods (unlike Staples). *Id*. at 4-5.

{¶ 38} By the start of 2000, Zoots was losing several million dollars a month, and that year, the company lost around $30,000,000. "By the start of 2001, the company had raised a total of $75 million to build out its four regional networks, and the impetus was on growing the volume in those networks and getting the operation both efficient and effective." *Id*. at 5. However, by mid-2003, Zoots was still losing money, despite the fact that the strategic elements of the business were in place. *Id*. at 7. A new CEO, Jim McManus, was then hired and put together a plan to "bring Zoots to profitability." *Id*. at 8. McManus attempted to streamline operations and shift growth technology to acquiring proven locations

and routes. *Id*. After 2004, Zoots completed 16 acquisitions. In "most deals" [not all] "50% of the price was paid in cash up front and 50% with notes." *Id*. at 9.

**{¶ 39}** By mid-2006, Zoots's management felt it had streamlined "reasonably well" and had a growth plan to develop new markets and acquisitions. Docket #55, Ex. 2(A), p. 9. Krasnow and McManus anticipated revenues increasing from $63,000,000 in 2006, to about $221,566,000 in 2011. Charitably speaking, this could be labeled wishful thinking. With the new capital and growth plans, Zoots's management predicted growing revenues at 25% per annum over the next few years and 15% indefinitely. Just what this projection was based on is not clear from the study, considering that:

**{¶ 40}** (1) – Based on the "Zoots Historical Financials" in the case study, revenues had increased between 2001 and 2005 at the following approximate rates (rounded up): 2001-2002 – 12.9%; 2002-2003 – 6.8%; 2003-2004 – 2.7%; 2004-2005 – 12%. At the same time, earnings losses before taxes were as follows: 2001 – $31,186,400; 2002 – $22,139,500; 2003 – $16,071,600; 2004 – $13,761,600; and 2005 – $10,456,400. *Id*. at pp. 13-14. For the fiscal year through September 2006, which is all this study shows, the earnings loss before taxes was $8,408,700, which is consistent with the earnings loss through that part of the fiscal year in 2005 ($8,461,900). *Id*. at p. 14.

**{¶ 41}** (2) – The case study acknowledges that in late fall 2006, when trying to raise $25,000,000 to fund growth and expansion, Krasnow's and McManus's "optimism was tempered with caution; the past eight years had not been easy ones for Zoots. More than $120 million had been invested in the company, and early results had been disappointing." Docket #55, Ex. 2(A), p. 1. This is an understatement. $126,399,792 had been invested in Zoots

from 1997 through 2006, with no return on capital, as the company had lost money every year. *Id*. at p. 24.

{¶ 42}    (3) – Furthermore, the consolidated balance sheet for September 30, 2006, is unaudited.   To the extent the figures reflected are not "disguised," they show that the company's liabilities exceed its tangible assets.   In addition, among the liabilities was a line of credit of $13,687,000, secured by the company's assets. The line of credit carried an interest rate of LIBOR (London Interbank Offer Rate) plus 6% and interest.   *Id*. at p. 15.

{¶ 43}    Thus, an individual looking at the financial statements of the company in September 2006, could well have been doubtful about the company's stability, as well as its ability to ever become profitable.   As of September 30, 2006, Zoots had been completely funded by investor capital and loans and had never shown a profit.   Krasnow and McManus were trying to decide what to recommend to the board, "in a context in which Zoots was running out of money and existing investors could simply not bring themselves to write another big check."   Docket #55, Ex. 2(A), p. 2.

{¶ 44}    Admittedly, as defendants contend, Charlesbank and J.P. Morgan Partners owned stock in the company.   However, Krasnow and McManus were attempting to raise another $25,000,000 in an environment in which the current investors were "tired."   Ex. 2(A), p. 10.   "Far too much investment had already gone into bringing Zoots to its current state."   *Id*.   The current investors would not on their own provide investment capital to fund the growth.   *Id*.   Furthermore, "the management team had seen its equity stake diluted, and at the same time, salaries had not grown (and a number of employees had been let go)." *Id*. at 11.

{¶ 45} Finally, the study notes that "[a]s McManus and Krasnow met with prospective investors, some were simply turned off by the long history of losses and the large amount of capital that had gone in without generating much in the way of a return." Ex. 2(A), p.11. "Others simply had a viscerally negative reaction to the industry." *Id.* A mid-size private equity firm had emerged as the most interested potential investor, but would likely require a controlling interest in the business. *Id.* How this would be received by Charlesbank and J.P. Morgan, which collectively owned 68.9% of the common shares of stock, is not explained in the study.

{¶ 46} Based on the above discussion, we conclude that the trial court erred in relying on the case study as having established, as a matter of law, that "due diligence" would have shown that Zoots was a stable company. If these figures had been presented to a prospective seller, the seller may well have chosen to walk away from the deal rather than accept the risk of an unsecured promissory note. As of September 30, 2006, Zoots had been completely funded since its inception by investor capital and loans, and had never shown a profit during nearly seven years of operation. Zoots was seeking another $25,000,000 in investment capital to expand, when prior expansion had never realized an actual profit, and the prediction of 25% future growth appears to be based on little more than wishful thinking. The fact that shareholders in the company included Charlesbank and JP Morgan Partners is irrelevant, because those parties were described as "tired," and had already expressed unwillingness to throw good money after bad.

{¶ 47} The trial court stated that it is speculative whether the Clarks would have stopped the deal if they had been advised, and that attorneys are not guarantors of deals. It is

correct that attorneys are not guarantors of business deals. However, the pertinent issue is whether the client was properly advised of the risk posed by selling its business with a substantial, unsecured unpaid balance of the purchase price.

**{¶ 48}** The trial court also noted that the "primary reason" the Clarks lost their profit was due to the 2008 financial collapse. There is no evidence in the record to establish that fact. Zoots had been losing enormous sums of money during its entire existence, which began ten years before 2008.

**{¶ 49}** Moreover, the issue is not whether the plaintiffs would have collected on their security interest in the bankruptcy. There is evidence that the prior secured creditors would have attained priority in the bankruptcy, although the evidence that was submitted could have been more complete.

**{¶ 50}** The Supreme Court of Ohio has held, in a different context, that "in an attorney-malpractice case, proof of the collectibility of the judgment lost due to the malpractice is an element of the plaintiff's claim against the negligent attorney." *Paterek v. Petersen & Ibold,* 118 Ohio St.3d 503, 2008-Ohio-2790, 890 N.E.2d 316, ¶ 1.

**{¶ 51}** In *Paterek*, the plaintiff's attorney dismissed a personal injury suit without prejudice and failed to refile the case within the time allowed by the savings clause. *Id*. at ¶ 3. In a later malpractice trial, it was established that the amount available for collection under the tortfeasor's insurance policy was $100,000. The trial court reduced the amount of the malpractice award to that amount following a jury award of $382,000 in damages, because it was also established that the tortfeasor had no other assets with which to pay a judgment. *Id*. at ¶ 9 and 17. On appeal, the Supreme Court of Ohio agreed with the trial court about the

limitation to the amount that the tortfeasor had available.[1]  The Supreme Court noted that:

> The jury in this case arrived at a figure for damages that was not necessarily reflective of the value of the Patereks' claim against their lawyers; the jury's damage award reflects what the Patereks suffered through the negligence of Richardson.  But the appellant attorneys in this case are not responsible for Richardson's negligent conduct; they are responsible for their own.  This case is not about what Irene Paterek suffered on account of Richardson's bad driving, but what she suffered on account of the appellants' bad lawyering.  The proper inquiry, then, is this:  Had the appellants not been negligent, how much could Irene have received from a settlement or a judgment?  *Id.* at ¶ 30.

**{¶ 52}**  The Supreme Court of Ohio then reasoned that:

> A judgment amount that is shown to be collectible provides a realistic picture of what a malpractice claimant actually lost. To find collectibility of the lost judgment irrelevant would "go beyond the usual purpose of tort law to compensate for loss sustained and would give the client a windfall opportunity to fare better as a result of the lawyer's negligence than he would have fared if the lawyer had exercised reasonable care." David A. Barry, Legal Malpractice in Massachusetts: Recent Developments (1993), 78 Mass.L.Rev. 74, 81–82. The finest attorneys in the world cannot coax blood from a stone.  *Id.* at ¶ 31.

**{¶ 53}**  Similarly, in the case before us, the Clarks may not have been able to recover

---

[1] The court did add $150,000, to account for the plaintiff's underinsured motorists coverage available, but this is not relevant for purposes of our analysis.  *Id.* at ¶ 45.

against Zoots if they had obtained a security interest for their note – although, as we said, the evidence on that issue could have been better presented. However, the Clarks lost their interest in a profitable business, which may not have occurred if they had been given proper advice. In this regard, the case before us is distinguishable from *Paterek*. The plaintiffs in that case had no alternative available to them other than prosecuting their personal injury lawsuit; here, the Clarks could have walked away from the deal. The defendants failed to meet their burden of establishing that the Clarks did not suffer any damages in this regard. We express no opinion on the merits of the case; we simply observe that there are factual issues precluding summary judgment.

{¶ 54}    Accordingly, the First Assignment of Error is sustained.


**IV. The Trial Court Erred in Failing to View the Evidence in the Clarks's Favor**

{¶ 55}    The Clarks's Second Assignment of Error is as follows:

THE TRIAL COURT FAILED TO VIEW THE EVIDENCE IN THE MOST FAVORABLE [SIC] TO THE PLAINTIFFS, AND THEREFORE FAILED TO FIND GENUINE ISSUES OF MATERIAL FACT FOR TRIAL ACCORDING TO THE SUMMARY JUDGMENT STANDARD IN OHIO.

{¶ 56}    Under this assignment of error, the Clarks contend that the trial court did not view facts in a light favorable to them, and disregarded their testimony that they would not have proceeded with the sale of their business, and could have continued to operate it, if they had been properly advised by their attorneys. We need not address this issue in detail, as we have already concluded that the trial court erred in rendering summary judgment and in failing

to fully consider the due diligence argument.

{¶ 57}  The Second Assignment of Error is sustained.

## V.  Conclusion

{¶ 58}  Both of the Clarks' assignments of error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

FROELICH and HENDON, JJ., concur.

(Hon. Sylvia Sieve Hendon, First District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Geoffrey P. Damon
Richard S. Wayne
Stephen E. Schilling
Hon. James W. Luse (sitting for Hon. Connie S. Price)