[Cite as *State ex rel. Bennett v. Dayton Pub. Schools Bd. of Edn.*, 2021-Ohio-3119.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO, EX REL. JAMEKA BENNETT, et al. | : | |
| | : | Appellate Case Nos. 28981 |
| | : | 28982 |
| Plaintiffs-Appellants | : | 28983 |
| | : | 28984 |
| v. | : | |
| | : | Trial Court Case Nos. 2018-CV-5436 |
| BOARD OF EDUCATION OF THE DAYTON PUBLIC SCHOOLS | : | 2018-CV-5437 |
| | : | 2018-CV-5438 |
| | | 2018-CV-5439 |
| Defendant-Appellee | | |
| | | (Civil Appeal from Common Pleas Court) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of September, 2021.

. . . . . . . . . . .

JULIUS L. CARTER, Atty. Reg. No. 0084170, 130 West Second Street, Suite 1622, Dayton, Ohio 45402
        Attorney for Plaintiffs-Appellants

BRODI J. CONOVER, Atty. Reg. No. 0092082 & ALEXANDER L. EWING, Atty. Reg. No. 0083934, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202
        Attorneys for Defendant-Appellee

. . . . . . . . . . . .

HALL, J.

{¶ 1} The appellants, four former supervisors with Dayton Public Schools, appeal from the trial court's entry of summary judgment in favor of the appellee Board of Education on their complaints for declaratory judgment and a writ of mandamus reinstating their employment following a reduction in force involving the school district.

{¶ 2} The appellants advance two assignments of error. First, they challenge the trial court's entry of summary judgment in favor of the Dayton Public Schools Board of Education. Second, they contend the trial court erred in its summary judgment ruling by failing to address "all the claims of all the parties."

{¶ 3} The appellants are Jameka Bennett, Erica Dowell-Evans, Richard Knight, and the administrator of the estate of Mychelle Brown.[1] In May 2016, they signed new two-year contracts to continue their employment in the position of "Transportation Supervisor II" in the school district's transportation department, which included the district's yellow school buses. Although the appellants' duties differed, they all were involved with supervising the district's school bus drivers. Shortly after the appellants signed their new contracts, the Board of Education hired a new superintendent, Rhonda Corr. Due to long-term declining enrollment and a corresponding loss of funding, Corr recommended streamlining operations within the school district and reducing or eliminating positions through reorganization and consolidation. Ultimately, approximately 20 administrators were recommended to have their contracts suspended as part of a

_____

[1] After this appeal was filed, one of the appellants, Mychelle Brown, passed away. Following a suggestion of death, we substituted Maria L. Shinn, Administrator of Brown's estate, as a party in Brown's place. For purposes of our analysis herein, references to the "appellants" still mean Bennett, Dowell-Evans, Knight, and Brown.

district-wide reduction in force (RIF). Included in that number were the four appellants.

{¶ 4} At the time of the proposed RIF, the transportation department was in undisputed disarray. Problems included chronic understaffing of bus drivers, aging buses, and poor route design. The school district was inundated with calls from parents complaining about their children being picked up late or not at all. The appellants frequently were forced to abandon their supervisory roles to substitute for absent bus drivers. Part of Corr's original strategy was to outsource supervision of the transportation department to a third-party vendor. The Board of Education rejected outsourcing and settled on district-wide reorganization that included a RIF.

{¶ 5} In late October 2016, the appellants were informed of the plan to abolish their positions and to suspend their contracts. They received notice that the Board of Education intended to vote on the recommended RIF at its November 17, 2016 meeting. Thereafter, the school district issued revised letters to the appellants on November 8, 2016, advising them that the vote would occur on either that same day, November 8, 2016, or on November 17, 2016. There is a dispute about whether this letter was hand-delivered to the appellants or mailed to them. In any event, the Board voted on November 8, 2016, to abolish the appellants' positions effective November 18, 2016.

{¶ 6} As part of Superintendent Corr's restructuring plan, Associate Superintendent Sheila Burton created the Transportation and Fleet Services Department. Unlike the former transportation department, which included just yellow school buses, this new department covered all district-owned vehicles. Burton also placed a dedicated call center in the new department. In addition, she brought training, compliance, and evaluation programs into the Transportation and Fleet Services Department. After the

reorganization, the school district posted vacancy announcements in late December 2016 for the newly created positions of Associate Director of Transportation and Fleet Services. The job description differed from the job description for the old Transportation Supervisor II position. As described in the posting, the new positions included more responsibilities and came with a higher salary. Although the appellants had "recall" rights for two years following the RIF, the school district did not notify them. Instead, the school district initially hired three other people to fill the new positions. Shortly thereafter, the district added a fourth person to fill a fourth position. The people hired into the new Associate Director of Transportation and Fleet Services positions included bus drivers who had been under the supervision of the appellants, a dispatcher, and a mechanic.

{¶ 7} In November 2018, the appellants filed separate complaints against the Board of Education, alleging both that their contracts improperly had been suspended and that they should have been recalled into the newly created positions. They sought declaratory judgment and a writ of mandamus restoring them to their prior positions and ordering them to be given new contracts in the position of Associate Director of Transportation and Fleet Services. The four cases were consolidated below. Following extensive discovery, the parties filed motions for summary judgment. In an April 21, 2020 ruling, the trial court entered summary judgment in favor of the Board of Education in each case. It reasoned as follows:

> In this case, the parties appear to agree that the Plaintiffs were "other administrators" as defined by R.C. 3319.02. Further, it is undisputed that R.C. 3317.171 gives the Board the authority to adopt an administrative personnel suspension policy. However, because the Board has adopted

such a policy, no administrator employment contract may be suspended except pursuant to the policy. The parties' disagreement relates to whether the Board complied with the RIF Policy in suspending the Plaintiffs' contracts.

Plaintiffs argue that the Associate Director position is essentially the same as the Transportation Supervisor II position, and thus the RIF policy required the Board to notify Plaintiffs via mail about the vacant job positions before offering the positions to anyone else. On the other hand, the Board argues that it was only required to mail Plaintiffs about vacant positions for which they are qualified, and that the Associate Director positions had an expanded role with added responsibility, and therefore it followed its policy and the law in suspending Plaintiffs' contracts.

Upon cross referencing the job descriptions provided by the Plaintiffs, the Court finds that the essential duties of an Associate Director substantially differed from the essential duties of Transportation Supervisor II. Under the latter position, the list of duties consisted of nearly half a page and mostly involved the management, direction, and supervision of bus drivers. Conversely, the list of essential duties for Associate Director is nearly two pages long and clearly illustrates a position with an expanded role with more responsibilities. For instance, in addition to the management and supervision of bus drivers, the Associate Director was responsible for supervising the operation efficiency of all District vehicles and not just the yellow school buses. They had authority to purchase, maintain and dispose

of the District's motor fleet. They also were responsible for working with the Director in developing policies, rules and regulations within the department. Finally, the Court notes that the salary listed in the last administrator contract for each Plaintiff amounted to $52,987, while the starting salary for Associate Director is $65,825.

The Plaintiffs argue that the Associate Director position only appears different from the Transportation Supervisor II position because the Transportation Supervisor II position had evolved over time. However, the only evidence to support this assertion is Plaintiffs' affidavit testimony. Also, the Plaintiffs point out that shortly after they were disciplined for misuse of District vehicles, the Transportation Supervisor II position was abolished. In other words, it appears Plaintiffs are arguing that the Board used the RIF as an excuse to terminate their employment. However, the Court finds that Plaintiffs' discipline history has no significance on the outcome of this case. Even if this Court were to assume arguendo that the Board was just looking for a convenient excuse to discharge Plaintiffs, the law allows the Board to suspend administrator contracts so long as it is done pursuant to the RIF Policy. The Board apparently did not believe Plaintiffs were qualified for the more advanced role of Associate Director, so they did not notify Plaintiffs about the positions. The RIF Policy only requires the Board to notify Plaintiffs about job vacancies for which they are qualified. Therefore, the Court concludes that the Board complied with the RIF Policy in suspending Plaintiffs' contracts.

(April 21, 2020 Decision, Order, and Entry at 5-6.)

{¶ 8} In their first assignment of error, the appellants challenge the trial court's entry of summary judgment against them. The appellants correctly note that they held written "administrator" contracts pursuant to R.C. 3319.02, which covers non-licensed supervisors and management-level employees. Another provision, R.C. 3319.171, authorizes a school board to adopt its own policies for the suspension of administrator contracts as part of a RIF. If such a policy is adopted, it must include the following:

(1) One or more reasons that a board may consider for suspending any contract of employment entered into under section 3319.02 of the Revised Code. A reason for such suspension may include the financial conditions of the school district or educational service center.

(2) Procedures for determining the order of suspension of contracts within the employment service areas affected;

(3) Provisions requiring a right of restoration for employees whose contracts of employment are suspended under the policy if and when any positions become vacant or are created for which any of them are or become qualified.

R.C. 3319.171(B)(1), (2), and (3).

{¶ 9} Consistent with R.C. 3319.171, the Board of Education adopted a policy in 2009 governing the suspension of administrator contracts. The policy, which was entitled "Reduction in Professional Staff Workforce," authorized the suspension of administrator contracts for reasons including decreased enrollment of students, financial considerations, and organizational restructuring. It also provided procedures for

determining the order of suspension. Finally, it provided as follows with regard to R.C. 3119.171(B)(3)'s requirement that affected employees have a right of restoration:

When any positions become vacant or are created for which professional staff are or become qualified, the following provisions will be followed to restore professional staff.

1. The Human Resources Department will maintain a list of employees whose contracts are suspended under this policy. When an employee's contract is suspended, the employee's name and current mailing address shall appear on such list and shall remain on such list for a period of up to two years from the last day of work, except for when the employee is restored to work during the two-year period, as further explained below.

2. All vacant and approved position job postings will be mailed to employees whose names appear on the above-described list.

3. Employees placed on the list are solely responsible to maintain a current mailing address at all times with the Human Resources office and are solely responsible to make sure their current mailing address appears on the above-described list.

4. Once the professional staff member returns to work in any position with the Board, the employee's name will be permanently removed from the list. Thus, no further job posting mailings will be sent to such employee. And, the Board obligations to restore the professional staff member under this policy will end upon the date the employee returns back to

work for the Board.

5. At the expiration of two years, if the employee is still not restored to work with the Board in any position, the employee's name will be removed from such list and the right to restoration under this policy will end.

6. The same factors used to determine reductions and reassignment of staff will be considered in determining who will be awarded vacant or created positions for which an employee holding a suspended contract is qualified.

(Defendant-Respondent's February 11, 2020 Summary Judgment Motion at Exh. A.)

{¶ 10} Here the appellants do not dispute the Board of Education's right to implement a RIF. They argue, however, that no RIF occurred with regard to their positions in the transportation department because those positions were not abolished. But even assuming that a true RIF occurred, the appellants further argue that they had a right to be recalled into any position for which they were qualified. The appellants assert that the school district improperly failed to create a recall list, to notify them of the new Associate Director of Transportation and Fleet Services positions, and to recall them into those positions. Although the job description for the new positions differed from the old Transportation Supervisor II job description, the appellants contend their old job description was outdated and that their actual responsibilities had evolved and expanded. The appellants further contend that they presented evidence establishing a genuine issue of material fact as to whether they were qualified for the new positions. Therefore, they argue that the Board of Education was not entitled to summary judgment on the basis that they were unqualified for the new jobs.

{¶ 11} Under Civ.R. 56, a trial court may enter summary judgment for the moving party "if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist. 1999). "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

{¶ 12} With the foregoing standards in mind, we find a genuine issue of material fact as to whether the appellants' positions were eliminated through a RIF involving the transportation department. There is no dispute that Dayton City Schools was experiencing declining enrollment and a corresponding loss of funding. Largely for these reasons, a recommendation was made that the Board of Education restructure and downsize the school district's administrative workforce, including but not limited to the transportation department.[2] (Corr depo. at 40-41.) Under the Board's policy, declining enrollment, loss of funding, and restructuring constitute valid reasons for a RIF.

{¶ 13} With regard to the transportation department, however, the record fails to establish that the declining enrollment and loss of funding adversely affected the school district's transportation of students. In her deposition, Associate Superintendent Burton

---

[2] Prior to adopting a RIF plan, school district leaders had discussed abolishing the entire transportation department and outsourcing transportation to a third-party vendor. (Corr depo. at 43.) But that idea "never got any traction" because the Board of Education opposed it. (*Id.*)

explained: "Even though we're losing students in [Dayton Public Schools], it doesn't mean we're losing them for transportation, because we transport students who are non-DPS students. * * * [E]ven though you leave our district, you go to a charter, we still transport you." (Burton depo. at 23.) We note too that the new Associate Director of Transportation and Fleet Services positions paid significantly more than the old Transportation Director II positions. We see no cost savings given that the Board of Education quickly replaced the four appellants after the RIF by hiring four new people to fill the higher-paid Associate Director of Transportation and Fleet Services positions.

{¶ 14} A RIF in the transportation department still might have been permissible as part of the broader restructuring plan within Dayton City Schools. Here, however, the school district employed the four appellants in the position of Transportation Supervisor II prior to the RIF. Within months after the RIF, the Board of Education had filled four new Associate Director of Transportation and Fleet Services positions. The Board argues that a RIF occurred because the new positions involved expanded responsibilities as part of the district-wide restructuring. This might be true if the new and expanded duties of the Associate Director of Transportation and Fleet Services positions were taken from some other employee who was terminated in the RIF. In such a case, the restructuring would result in a demonstrable reduction in force.

{¶ 15} In the proceedings below, however, the appellants disputed whether their old Transportation Supervisor II positions had been abolished or even revised. The appellants separately averred, among other things, that they had reviewed the position description and vacancy announcement for the Associate Director of Transportation and Fleet Services position. They also averred that the duties described in the vacancy

announcement appeared to be the same duties they were performing, or had performed, prior to their termination. They further averred that they previously had supervised three people hired into the new position and could perform all of the duties identified by those new employees. (Bennett, Dowell-Evans, Brown, and Knight Affidavits accompanying Plaintiffs-Relators' March 23, 2020 Response Opposing Defendant-Respondent's Motion for Summary Judgment.)

{¶ 16} Based on the appellants' affidavits, a trier of fact reasonably could find that the school district did not abolish their positions in the RIF and subsequently create revised positions. Rather, according to the appellants, the school district renamed their old Transportation Supervisor II positions and created a new job description for the position of Associate Director of Transportation and Fleet Services that reflected what they already had been doing. If the four appellants' affidavits are credited, then the Board of Education simply suspended their administrator contracts, purportedly as part of the district-wide RIF, and promptly hired four new people to perform the same duties the appellants had been performing.

{¶ 17} The record also contains testimony from which a trier of fact reasonably could infer that the Board of Education had a motive for replacing the appellants with new employees who performed essentially the same job. Board of Education member Sheila Taylor expressed her belief that the transportation supervisors were included in the RIF "because the department was in such disarray." (Taylor depo. at 50.) She attributed the decision to eliminate the appellants' positions to "all the chaos that was going on in that department" and a need "to change the atmosphere[.]" (*Id.* at 26.) Board of Education member John McManus described the transportation department before the RIF as

"beyond dysfunctional" and "an embarrassment." (McManus depo. at 21.) He acknowledged having "discussions amongst the Board Members about getting rid of the transportation supervision because of all the issues that were going on[.]" (*Id.* at 37-38.) McManus recalled understanding that departments that lost supervisors, including the transportation department, "would have a replacement" and "new supervisors would come in" so that "the ordinary course of business could be maintained." (*Id.* at 38.) With regard to the transportation department in particular, McManus stated that it "could not get any worse" than it was when the four appellants were employed. (*Id.* at 40.) He added that "[l]osing the leadership that was in transportation was not going to negatively [a]ffect transportation because it was in such a state of mismanagement." (*Id.*) For that reason, McManus "didn't shed a tear" when he saw the names on the RIF list. (*Id.* at 49.) Based on our review of the entire record, and construing the evidence in a light most favorable to the appellants, we believe a trier of fact reasonably could find that the district-wide RIF was used to rid the transportation department of them. The record supports a reasonable inference that the appellants' inclusion in the RIF was a matter of housecleaning rather than reducing headcount.

{¶ 18} Finally, we note our inability to identify any other Dayton City Schools administrator whose employment was terminated as a result of the restructuring that purportedly resulted in the new Associate Director of Transportation and Fleet Services position being given additional responsibilities. In other words, even if the newly created position did involve some added responsibilities, it does not appear that those responsibilities were taken from another employee who was eliminated by the RIF.

{¶ 19} For all of the foregoing reasons, a trier of fact reasonably could conclude

that no true reduction in force occurred as far as the appellants were concerned. Construing the evidence in a light most favorable to the appellants, we find a genuine issue of material fact on that issue.

{¶ 20} Even assuming, arguendo, that a true RIF did occur in the transportation department, we also find a genuine issue of material fact as to whether the appellants had restoration or "recall" rights to the new Associate Director of Transportation and Fleet Services jobs. Associate Superintendent Sheila Burton testified that she assumed responsibility for the revised transportation department after the RIF and played a role in developing the new Associate Director of Transportation and Fleet Services positions. (Burton depo. at 25, 29.) She determined that these new positions "would have to have some different job responsibilities." (*Id.* at 30.) In particular, the new positions included supervision of all district-owned vehicles, not just school buses. Burton also added attendance at the 18-month training course to learn "what it took to be a transportation director" and to know "how to manage and lead individuals." (*Id.* at 31.) Burton explained that for the most part the newly hired individuals were able to perform the tasks assigned to them when hired. The additional training was to teach them how to do each other's jobs in case that became necessary. (*Id.* at 49-53.) Finally, Burton mentioned dividing various job responsibilities between the new associate directors based on their skills and strengths. (*Id.* at 31-33, 49-53.)

{¶ 21} Executive Director of Human Resources Judith Spulock testified that recall rights existed only "if the same exact position" was reestablished. (Spurlock depo. at 37.) In Spurlock's opinion, the appellants were not entitled to be recalled because the Transportation Supervisor II positions from which they had been "RIFed" were not

reestablished. (*Id.* at 37-38.) Spurlock believed that employees impacted by the RIF had no right to be recalled into non-identical positions even if they were qualified. (*Id.* at 38.) In her opinion, employees who lost their jobs through the RIF had no right even to be notified of job openings unless the open position was the exact same one from which they had been removed. (*Id.* at 46.)

{¶ 22} Andrae Hicks, who served under Spurlock in human resources, testified that he worked on preparing job postings in the two-year period following the RIF, and he never heard anything about any of the postings being sent to employees who had lost their jobs in the downsizing. (Hicks depo. at 91-92.) Spurlock herself admitted that the job posting for the new Associate Director of Transportation and Fleet Services positions was not sent to the appellants. (Spurlock depo. 103-104.) Despite her position as the head of the department responsible for the new job postings and the recall list, Spurlock admitted not even knowing whether the appellants were qualified for the Associate Director of Transportation and Fleet Services positions. (*Id.* at 48-49.)

{¶ 23} Board of Education member John McManus also remembered being told "that the job descriptions and the duties of the [Associate Director of Transportation and Fleet Services] job were going to be different because of a restructuring; and, therefore, right to recall was not applicable." (McManus depo. at 58-59.)   On the other hand, Board of Education member Sheila Taylor believed that the appellants at least would have the opportunity to apply for the newly-created positions along with anyone else who was interested. (Taylor depo. at 28-36.) Taylor expressed her opinion that the appellants had recall rights because they were not fired for cause. Instead, the entire transportation department "was being looked at" as part of the RIF restructuring. (*Id.* at 76.)

{¶ 24} Based on the record before us, a trier of fact reasonably could find that the appellants were not even considered for the new Associate Director of Transportation and Fleet Services positions. As set forth above, the record contains evidence that they were not informed of the new positions, human resources head Spurlock testified that the appellants were not entitled to be recalled because their old positions were not identical to the new ones, and Spurlock did not even know whether the appellants were qualified for the new positions. Construed most strongly in the appellants' favor, this evidence suggests that the appellants were not considered as candidates for the new positions.

{¶ 25} Under R.C. 3319.171(B)(3), however, the Dayton City Schools' RIF policy was obligated to include "[p]rovisions requiring a right of restoration for employees whose contracts of employment are suspended under the policy if and when *any positions become vacant or are created for which any of them are or become qualified."* R.C. 3319.171(B)(1), (2), and (3). Contrary to the view of Spurlock and other school-district representatives, the appellants' recall rights were required by statute to extend to *any available positions* for which they were or became qualified. In accordance with this requirement, the Dayton City Schools' RIF recall policy states that it applies "[w]hen any positions become vacant or are created for which professional staff are or become qualified[.]" It further provides that "[a]ll vacant and approved position job postings will be mailed to employees whose names appear" on the recall list. It also addresses employees being "restored to work" within two years "in any position." (Defendant-Respondent's February 11, 2010 Summary Judgment Motion at Exh. A.) We note too that a Dayton Public Schools information packet advised that administrative staff who lost their jobs through the RIF were entitled to apply for any posted position for which the affected

administrators believed they were qualified. (Plaintiffs-Relators March 23, 2020 Response Opposing Summary Judgment at Exh. 26.) Consequently, the appellants' recall rights turn on whether they were qualified for the new Associate Director of Transportation and Fleet Services positions, not on whether the new positions were identical to the old Transportation Supervisor II positions.

{¶ 26} On appeal, the Board of Education suggests that the appellants were not recalled into the new positions because they were unqualified. In its appellate brief, however, the Board cites no deposition testimony or other evidence from anyone stating that the appellants in fact were not qualified. It its April 21, 2020 summary-judgment ruling the trial court stated that "[t]he Board apparently did not believe Plaintiffs were qualified for the more advanced role of Associate Director, so they did not notify Plaintiffs about the positions." We conclude there is at least a genuine issue of material fact in regard to whether the appellants were qualified. As we have explained, the record supports a finding that the appellants were not recalled—or even considered for recall—because the new positions were not identical to their old positions. This is essentially what human resources head Spurlock said when she admitted not knowing whether appellants were qualified for the new jobs and explained that they had no recall rights, regardless of their qualifications, because such rights existed only "if the same exact position" was reestablished. (Spurlock depo. at 37, 48-49.)

{¶ 27} Based on the language of R.C. 3319.171(B)(3) and the Board of Education's RIF recall policy, the critical issue is whether the appellants were qualified to fill the Associate Director of Transportation and Fleet Services positions. The trial court's ruling compared the position description for Transportation Supervisor II and Associate

Director of Transportation and Fleet Services and concluded that the latter position involved an "expanded role with more responsibilities" and higher pay. Based on the differences in the two positions on paper, the trial court appears to have found that the appellants were not qualified for the new jobs as a matter of law. In reaching this conclusion, it did not consider the appellants' argument that the Transportation Supervisor II positions had evolved over time and included responsibilities greater than those mentioned in their job description. The trial court stated that the only evidence supporting the appellants' claim that their jobs had evolved over time was their own affidavits.

{¶ 28} Construing the evidence in a light most favorable to the appellants, we believe a genuine issue of material fact exists as to whether they were qualified for the Associate Director of Transportation and Fleet Services positions. Notably, the appellants filed their own detailed affidavits in the proceedings below addressing their experience and qualifications for the new positions. Appellant Bennett's affidavit states in part:

7. I was capable of successfully performing all the duties of my position when my contract was suspended in 2016.

8. I was capable of replacing the other Transportation Supervisor II positions whenever one of my co-workers was unavailable in 2016.

* * *

15. I was notified in the Reduction in Force meeting that all vacancy announcements would be mailed to my mailing address whenever a new position was posted for applicants.

16. I never received any mailing of vacancy announcements from the Dayton Public Schools following my termination on November 18, 2016.

17. I never received any recall notices and was never contacted by Dayton Public Schools regarding my recall rights.

18. I have reviewed the position description of Associate Director of Transportation and Fleet Services that was posted by Dayton Public Schools on or about December of 2016.

19 The duties described in the vacancy announcement for Associate Director of Transportation and Fleet Services position appear to be the same duties that I was performing, or had performed, prior to my termination on November 18, 2016.

20. Dayton Public Schools never contacted me about the Associate Director of Transportation and Fleet Services position by recalling me or letting me know of the Vacancy Announcement.

21. I was a supervisor for Torronce Jackson, Terrence Jackson, and Andrea Ludd prior to my termination on November 18, 2016.

22. Torronce Jackson, Terrence Jackson, and Andrea Ludd were all promoted to the position of Associate Director of Transportation and Fleet Services during the period when I had recall rights.

* * *

27. I was capable of receiving new training when my employment with Dayton Public Schools was terminated on November 18, 2016, **and I had already supervised fleet vehicles**.

28. I have reviewed the deposition transcript of Torronce Jackson, Terrence Jackson, and Andrea Ludd and can perform all the duties they have

described for their positions.

29. I supervised the garage and all the mechanics during my time as a Transportation Supervisor, prior to the RIF, and the Transportation Department did all the maintenance on the fleet vehicles unless it was a repair that required me to get an outside company to do the repair.

30. I was responsible for the registration and licensure of all the fleet vehicles, prior to the RIF, and the Transportation Department has always been responsible for the fleet vehicles since I was initially promoted to Transportation Supervisor II.

31. I have received training through the State of Ohio intended for transportation supervisors and covering many different areas of transportation. My certificates from this training were turned in to the district.

32. The tier bells are set at the beginning of the school year and approved by the Board of Education.

33. The Transportation Department had a call center that was part of the department beginning in approximately the 2014-2015 school year, which was supervised by Transportation Supervisor Mychelle Brown. The call center was later moved to the central office downtown.

34. The Transportation Department had a PBX Operator that answered calls when there was no call center at the facility, and she would route those calls to the Director, Supervisors, or dispatcher.

35. I was responsible for training and compliance for all drivers within the district. We have always had training and compliance requirements for the

State of Ohio.

36. I am an On Board Instructor and I trained Terrence Jackson to be an On Board Instructor for the district.

37. I was contracted [sic] by Transportation Director Michael Rosenberger, after the RIF, and he requested that I assist him in doing the T-Reports required by the State of Ohio.

(Bennett Affidavit accompanying Plaintiffs-Relators' March 23, 2020 Response Opposing Defendant-Respondent's Motion for Summary Judgment.)

{¶ 29} Appellants Dowell-Evans, Brown, and Knight provided similar affidavits. As mentioned above, they averred that they had reviewed the position description and vacancy announcement for the Associate Director of Transportation and Fleet Services position. They also averred that the duties described in the vacancy announcement appeared to be the same duties they were performing, or had performed, prior to their termination. They further averred that they had supervised Torronce Jackson, Terrence Jackson, and Andrea Ludd, who were hired at various times to fill vacant Associate Director of Transportation and Fleet Services positions, and could perform all of the duties identified by the Jackson brothers and Ludd as part of the new positions. Although the trial court discounted these affidavits, apparently on the basis that they were self-serving, we find them sufficiently detailed and specific to establish a genuine issue of material fact regarding the appellants' qualification for the new jobs. If the appellants testified at trial consistent with their affidavits, a trier of fact reasonably could conclude that they were qualified to fill the position of Associate Director of Transportation of Fleet Services.

{¶ 30} We note too that the appellants' affidavits are not the only evidence

supporting their claims. James Wallace served as Transportation Director and supervised the appellants for several years until shortly before the RIF, when Mike Rosenberger assumed the director's position. In his deposition, Wallace testified that appellant Brown primarily was responsible for supervising dispatchers, appellant Evans supervised the "routers" and paraprofessionals, appellant Knight supervised transportation for parochial and charter schools, and appellant Bennett supervised training and the mechanics. (Wallace depo. at 60.) According to Wallace, each of the four appellants knew the full "day-to-day operations" of the Transportation Department. They were capable of filling in for each other and filling in for him. (*Id.* at 60-61.) Wallace also reviewed the position description for the newly created Associate Director of Transportation and Fleet Services positions. He opined that the appellants were capable of performing all of the listed duties. (*Id.* at 86-87.) While serving as Transportation Director, Wallace also had supervised brothers Terrance and Torronce Jackson as well as Andrea Ludd, all of whom had been school bus drivers. (*Id.* at 88-89.) After the RIF, they were hired to fill vacant Associate Director of Transportation and Fleet Services positions. Wallace was unaware of any specialized knowledge they possessed related to those positions. (*Id.* at 89.)

{¶ 31} When discussing one aspect of his own Associate Director of Transportation and Fleet Services responsibilities, Terrance Jackson stated that "anybody could do it." (Terrance Jackson depo. at 24.) When asked what he had learned about performing the Associate Director of Transportation and Fleet Services job *after* being given it, Terrance Jackson responded that he "could go on forever." (*Id.* at 27.) When Terrance's brother Torronce Jackson got his Associate Director of Transportation and Fleet Services job, he had little prior management experience. (Torronce Jackson

depo. at 12.) Torronce Jackson testified that managing the entire fleet of school-district vehicles was not significantly different than managing just the yellow school buses. (*Id.* at 23-25.) He explained that the only real difference was the yellow school buses requiring *more* work because they had to be inspected. (*Id.*) He believed that someone who could supervise school buses (i.e., the appellants) could supervise fleet vehicles. (*Id.*)

{¶ 32} Finally, according to Superintendent Corr, applicants hired to fill the Associate Director of Transportation and Fleet Services positions were all sent to an 18-month training course "to know what it took to be a transportation director." (Corr depo. 31-32.) She also sent them to leadership training "so they knew how to manage and lead individuals[.]" (*Id.*) In her deposition, Associate Superintendent Burton clarified that newly hired associate directors largely were able to perform the responsibilities assigned to them when hired. The additional training was to enable them to perform one another's jobs. (Burton depo. at 49-53.) According to former Transportation Director Wallace, however, the four appellants already knew how to perform each other's jobs. And the appellants' affidavits support a finding that the new jobs functionally were the same as their old jobs. Construed most strongly in the appellants' favor, the evidence suggests that the appellants were qualified for the new positions. We find a genuine issue of material fact on that issue. The first assignment of error is sustained insofar as the trial court erred in entering summary judgment for the Board of Education.[3]

---

[3] The appellants also seem to suggest that the trial court should have entered summary judgment in their favor on their complaints for declaratory judgment and a writ of mandamus. In the conclusion of their brief, they appear to ask us to remand with instructions for the trial court to issue the requested writ. We note, however, that the appellants' assignment of error is limited to the trial court's entry of summary judgment in favor of the Board of Education. Therefore, we express no opinion as to whether the appellants should have been granted summary judgment. In finding genuine issues of

**{¶ 33}** In their second assignment of error, the appellants contend the trial court erred in "failing to address all the claims and all the parties when deciding Summary Judgment." Although the appellants' brief fails to argue this issue, we previously resolved it in a March 5, 2021 Decision and Entry. In rejecting an argument that no final appealable order existed, we held that the trial court did fully resolve all claims involving all parties when it entered summary judgment in favor of the only defendant and against all of the plaintiffs on all of their claims. Based on the reasoning set forth in our March 5, 2021 Decision and Entry, the second assignment of error is overruled.

**{¶ 34}** Having sustained the appellants' first assignment of error, we reverse the trial court's entry of summary judgment in each case in favor of the Board of Education and remand the cases for further proceedings.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Julius L. Carter
Brodi J. Conover
Alexander L. Ewing
Hon. Gregory F. Singer

---

material fact, we mean only that the record does not support the entry of judgment as a matter of law in favor of the Board of Education, which is the only issue raised by the first assignment of error.